Susan E. CULLEN, Mary Beth Phelps and Monica Davis, individually and as representatives of a Class of Students of Ultrasound Diagnostic Schools, Plaintiffs,

and

Melissa Mann and Kelly Smith, intervenor plaintiffs, individually and as representatives of a Class of Students of Ultrasound Diagnostic Schools

v.

WHITMAN MEDICAL CORPORATION d/b/a Whitman Education Group, Inc.; Ultrasound Technical Services; Phillip Frost; Richard C. Pfenninger; Randy Proto; Fernando L. Fernandez; Richard B. Salzman; Joseph Lichtenstein; Milton Gallant; and William Speir, Defendants.

No. CIV.A. 98–CV–4076.

United States District Court, E.D. Pennsylvania.

Oct. 3, 2000.

---

140

**142**

Kay E. Sickles, Sandals, Langer & Taylor, LLP, Ruben Honik, Greitzer & Honik, Roberta D. Liebenberg, Fine, Kaplan and Black, Howard Langer, Sandals & Langer, LLP, Philadelphia, PA, for Susan E. Cullen, Mary Beth Phelps, and Monica Davis, Individually and as a representative of a Class of Students of Ultrasound Diagnostic Schools.

Darryl J. May, David S. Fryman, Ballard, Spahr, Andrews and Ingersoll, Philadelphia, PA, Peter W. Homer, Greer, Homer, Cope and Bonner, P.A., Miami, FL, Matthew A. White, Jerome J. Shestack, Geoffrey N. Blue, M. Norman Goldberger, Nathan E. Kase, Wolf, Block, Schorr & Solis-Cohen LLP, for Whitman Medical Corporation d/b/a Whitman Education Group, Inc., Ultrasound Technical Services, Phillip Frost, Richard C. Pfenninger, Randy Proto, Fernando L. Fernandez, Richard B. Salzman, Joseph Lichtenstein, Milton Gallant, and William Speir.

## MEMORANDUM AND SETTLEMENT APPROVAL ORDER AND FINAL JUDGMENT

ANITA B. BRODY, District Judge.

Before me are class counsel's petitions for final approval of the settlement agreement, for special incentive awards for class representatives and persons initiating suit, and for attorneys' fees and reimbursement of costs. On September 15, 2000, I held a hearing on these petitions.

### I. Background

On August 5, 1998, named plaintiffs filed this class action complaint on behalf of themselves and a proposed class. The class action was brought against a vocational school and its parent company for fraudulently misrepresenting to the students the education they would receive. The named plaintiffs as well as the unnamed class members were students at the Ultrasound Diagnostic School ("UDS"), a vocational school operated by Ultrasound Technical Services, Inc. ("UTS"), which is a subsidiary of the Whitman Educational Group ("Whitman"), a publically traded corporation. UDS holds itself out as a provider of education in the field of diagnostic medical sonography. Plaintiffs claimed that defendants employed a fraudulent scheme of misrepresenting the nature of the ultrasound program, and failed to provide the education represented. Plaintiffs also contended that the defendants misrepresented the graduation and placement rates of students to the Accrediting Bureau of Health Education Schools ("ABHES"), the institutional accrediting body, in order to qualify for federally guaranteed student loans. Plaintiffs claimed that the defendants had no meaningful admissions criteria for students and that they hired unqualified administrative personnel who turned over annually. In sum, plaintiffs asserted that while UDS held itself out as a school to prepare students for entry level sonography positions, the school was a sham that failed to meet even the most minimal and basic standards for an ultrasound program. Throughout the litigation, defendant vigorously contested all of the allegations.

On July 22, 1999, I issued an opinion certifying the class. The class was certified based upon the "complete sham" theory. Following the certification, there was extensive briefing on the form and content of the notice to the class. On December 27, 1999, I ordered that plaintiffs mail notice to all class members by January 4, 2000. Class counsel filed an affidavit that the notice was mailed. The notice included an opportunity to opt-out of the class.

On March 3, 1999, I ordered the parties to participate in a settlement conference before Magistrate Judge Welsh. Several settlement conferences took place between April and December of 1999, but no agreement was reached. Throughout this period, both parties actively pursued discovery. Plaintiffs posit that a major turning point in the case

was the October 29, 1999 oral argument. On that day, I heard argument on several of plaintiffs' pending motions to compel. I ordered immediate production of certain documents and I made myself available for weekly conferences to assure there would be no further discovery abuses. As an offshoot of the conference program, on January 31, 2000 I began a series of settlement conferences with the parties.

Finally, on May 4, 2000, working with the parties the entire day and into the evening, a settlement sum was reached. Subsequently, the parties worked together to negotiate the non-monetary terms of the settlement agreement.

On June 22, 2000, upon stipulation of the parties, I modified the definition of the class to include students who did not finance their classes with student loans and students who were enrolled in the Noninvasive Cardiovascular Technology program. The definition of the class is now:

> All persons who attended the UDS Diagnostic Medical Ultrasound Program or the UDS Noninvasive Cardiovascular Technology Program at any time during the period of August 1, 1994 through August 1, 1998.

The class consists of approximately 5,300 members.

In July, class counsel filed motions for preliminary approval of the settlement agreement, a proposed plan of distribution of the settlement fund, and a motion for attorneys fees and costs. On July 21, 2000, I granted preliminarily approval of the parties' settlement agreement and the proposed plan of distribution. I also ordered class counsel to mail notice of the proposed settlement and settlement hearing to the potential class members no later than July 26, 2000. The notice stated that class counsel would request an award of attorneys' fees to the court of up to one third of the net settlement. The notice also provided an opportunity for class members to opt out of the class. It further instructed class members to file any objections with the court prior to the Fairness Hearing.

The parties' settlement agreement provides for payment of $5.97 million in cash and approximately $1.3 million in loan forgiveness of delinquent obligations owed by students to the schools. It also provides for certain non-monetary relief enforceable by the Court. For example, over the next four years, UTS agrees to maintain certain admissions criteria and to adhere to those criteria. Additionally, the agreement provides that I will appoint an ombudsman who will report directly to me annually regarding UTS's adherence to its admission requirements in its actual admissions of students.[1] Various other non-monetary relief includes increased screening of faculty, reform of the method in which the entrance examination is given to potential students, certain disclosures, and a cooling-off period for admitted students allowing them to withdraw at no penalty.

On July 24, 2000 plaintiffs filed motions for final approval of the settlement agreement, for attorneys fees and costs, and for incentive awards for class representatives and persons initiating suit. On September 15, 2000, I held a hearing on these motions. No persons who were mailed the July notice opted out of the class, and only one objection to the settlement was filed. I provided an additional opportunity for objections to be voiced at the hearing. No other objections were raised.

## II. Discussion

### A. Final Approval of Settlement

Class plaintiffs seek a final order approving the proposed settlement with all defendants. Approval is sought in accordance with Federal Rule of Civil Procedure 23(e), which provides that: "A class action shall not be dismissed or compromised without the approval of the court..." For the following reasons, I will grant final approval.

Approval of a proposed class action settlement is within the discretion of the court. *See In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 148 F.3d 283, 299 (3rd Cir.1998). "In determining whether settlement should be approved, the court must decide whether it is fair, reasonable, and adequate under the circumstances and

---

1. By stipulation of the parties, I have appointed Anne Markey Jones as ombudsman.

whether the interests of the class as a whole are being served if the litigation is resolved by the settlement rather than pursued." Manual for Complex Litigation, § 30.42, at 238 (3d ed.1995). The Third Circuit applies a nine prong test when determining the fairness of a proposed settlement (1) adequacy of settlement in light of best possible recovery; (2) adequacy of settlement in light of all risks of litigation; (3) complexity of suit; (4) reaction of class; (5) stage of proceedings; (6) risks of establishing liability; (7) risks of maintaining class status; (8) risks of establishing damages; and (9) ability to withstand greater judgment. *See Girsh v. Jepson,* 521 F.2d 153, 157 (3rd Cir.1975). I find that the settlement reached satisfies the Girsh factors.

■ The last of the Girsh factors is the dominant consideration favoring settlement in this case. There was great risk that even if the class were able to obtain a successful verdict, it would have resulted in an uncollectible judgment. A favorable judgment for the class would have rendered the defendant insolvent and would have immediately disqualified it from the federal financial aid programs. This would have effectively ended defendant's existence as a going concern. Defendant lacked significant hard assets or cash against which the class could have levied. There was a substantial question as to whether any insurance exists that would provide coverage for the claims asserted by the class had the claims been tried.

■ The remaining eight factors, addressed here in order, lend additional support to my approval of the settlement. First, in light of the best possible recovery, the proposed settlement is fair and reasonable. Even if the proposed settlement only amounts to "a fraction of the potential recovery," it does not necessarily follow that the settlement "is grossly inadequate and should be disapproved." *In re Sunrise Sec. Litig.,* 131 F.R.D. 450, 457 n. 13. Here, assuming total tuition to the class would represent an appropriate measure of damages, single damages to the class approached forty-two million dollars. The settlement that was achieved represents approximately seventeen percent of single damages to the class, an amount significantly higher than the proportion of damages obtained in settlement agreements approved by other courts. *See, e.g., In re Crazy Eddie Sec. Litig.,* 824 F.Supp. 320, 324 (E.D.N.Y.1993).

■ Second, the settlement must also be balanced against all of the risks of further litigation. There was a considerable risk that plaintiffs would not prevail under the "complete sham" theory, which required the most extreme measure of proof. They faced significant obstacles to success, including consistent inaction by government agencies, positive student satisfaction surveys, and testimony by employers who had hired some of defendant's graduates. The legal and factual difficulties inherent in this type of case, together with the unpredictability of a lengthy trial, the appellate process that would follow a victory for plaintiffs at trial, and the ultimate virtual certainty of defendants' insolvency were plaintiffs to have succeeded at each of these levels make the fairness of the settlement readily apparent.

■ Third, even if plaintiffs would have been able to collect a judgment, the complexity, expense and possible duration of the litigation would have significantly depleted the limited funds available to the class members. By the time of the settlement, it had become apparent that continued costs and fees would have substantially limited the ultimate fund. There was every reason to believe that there would have been very high additional costs if the case proceeded to litigation.

■ Also, the reaction of the class to the proposed settlement was overwhelmingly positive. Out of over 5,250 persons who received notice of the settlement, not a single class member chose to opt out of the Settlement Agreement, and there was only one objector. His objection related to his desire for a higher award because of severe hardship allegedly experienced that he attributed to defendant.

■ As for the stage of the proceedings, courts generally recognize that a proposed class action settlement is presumptively valid where, as in this case, the parties

engaged in arm's length negotiations after meaningful discovery. *See, e.g., Grier v. Chase Manhattan Automotive Finance Co.,* 2000 WL 175126 (E.D.Pa. Feb. 16, 2000). "The professional judgment of counsel involved in the litigation is entitled to significant weight." *Fisher Bros. v. Cambridge–Lee Industries, Inc.,* 630 F.Supp. 482, 488 (E.D.Pa.1985). The settlement in this case was reached at a stage when the litigation was significantly advanced so that all parties were fully informed of the strengths and risks in their positions.

■ As already discussed, the risks of establishing liability under the "complete sham" theory were substantial. Finally, considering that this was a fraud case against an educational enterprise, the possibility of decertification was present. The settlement is the largest recovery ever obtained against a trade school in a reported class action brought by students. It achieves an immediate recovery for the members of the class that substantially exceeds the likely recovery to the class had the case proceeded to judgment, while avoiding the considerable risks and expenses inherent in trial. In addition, I personally participated in the settlement negotiations and had extensive communication with counsel. Through my participation, I gained great confidence that this settlement agreement is in the best interest of the class. Considering all of the circumstances, I find this settlement to be fair, reasonable and adequate.

## B. Incentive Awards

The class representatives and students initiating the case seek an incentive award from the fund equaling their tuition paid. The contribution of each of these plaintiffs to the action has been well documented by class counsel. Because each of the persons seeking an incentive award played a significant role in achieving the ultimate result, I will grant their request for an incentive award equal to their tuition paid.

■ Incentive awards are "not uncommon in class action litigation and particularly where, as here, a common fund has been created for the benefit of the entire class." *In re Southern Ohio Correctional Facility,* 175 F.R.D. 270, 272 (S.D.Ohio 1997). In fact, "[c]ourts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." *Id.* (citing numerous cases in which incentive awards were granted). Judges of this district have not hesitated to assure that those undertaking class litigation are not penalized for placing a class's interest above their own. *See, e.g., In re SmithKline Beckman Corp. Securities Litigation,* 751 F.Supp. 525 (E.D.Pa.1990); *Perod v. McKenzie Check Advance of Pennsylvania,* No. 98–CV–6787 (E.D. Pa. Order June 5, 2000).

Seeking incentive awards are: Ruth Dillon, Deborah Dougherty, Susan Cullen, Monica Davis, Kelly Smith, Melissa Mann.

■ Ruth Dillon and Deborah Dougherty initiated these lawsuits through individual actions in 1996. Although their allegations sounded at first incredible, they ultimately persuaded counsel to file their actions by presenting a tape recording of a meeting they had with school officials, which they had ingeniously obtained permission from the school to record. The individual suits by Ms. Dillon and Ms. Dougherty were ultimately stayed to allow the class action to proceed, but the seeds of the class action were sewn in the individual cases. Both women spent many hours investigating and accumulating information to support the case, describing the case to counsel, assembling documents, and sitting for depositions.

■ Mary Beth Phelps was a model class representative for this case. She experienced virtually all of the abuses alleged by the class and remained wholly committed to the effort throughout the case. She was a single mother who was admitted to the school without the requisite credentials and without an entrance exam. She was ultimately granted her degree even though she had failed the clinical portion of the program. Subsequently, unable to find a job she went on public assistance for which she was required to document her job search, which she did very meticulously. She had also maintained all of her documentation from the school and from every stage of her experi-

ence. She produced all of these materials to counsel and risked the embarrassment of her records becoming public. She also spent days assembling material, helping prepare and review the complaint, and prepared for and sat through a lengthy and grueling deposition.

■ Susan Cullen was also a model class representative, but for different reasons. Prior to being admitted to the school, she took the admissions examination and failed. At the time she was admitted, she was a certified radiology technician and had been employed by a highly respected hospital for years. She was able to assist counsel early in the litigation by explaining how UDS failed to prepare her as sonographer by comparing her education in radiology to her education at UDS. She also knew what was required to work with patients in a radiology department (in which ultrasound scans are generally taken) and could describe why, upon completion of her course at UDS, she was not competent to perform sonograms. In addition, through her connections with area hospitals and other individuals who attended UDS, she was able to furnish counsel with numerous vital witnesses. Ms. Cullen spent days assisting counsel, making calls to her contacts, and collecting documents. She also reviewed the complaint many times, sat for a full day deposition, and maintained her efforts throughout the case.

■ Monica Davis only seeks a modest incentive award because she only attended UDS for a brief period. Ms. Davis met with counsel and reviewed the complaint before it was filed. She also gathered her documents in response to document requests and was deposed for a full day.

■ Kelly Smith is the intervener class representative for the Noninvasive Cardiovascular Technology Program (CVT) class. While she only became formally involved in the case at a late stage, she had, in fact, been much involved in the litigation earlier. Ms. Smith worked for one of the medical staffing agencies (in Yardley near the Trevose location of UDS) upon which class counsel had served a subpoena calling for all records relating to UDS students. Because she herself had attended UDS she agreed, with permission from her employer, to take the time to teach class counsel her employer's complex computer system. The system tracked every comment from a health care provider contacted regarding a UDS student. As a result of her extensive efforts, class counsel was able to obtain the names of numerous major providers who either recorded adverse experiences with UDS students or who refused to accept them for interviews outright. In addition, Ms. Smith had sought counsel earlier to represent her when she learned of the suit on behalf of ultrasound students. She agreed to defer bringing suit pending the outcome of settlement discussions, and she agreed to serve as a class representative when the appropriate time arrived.

■ Melissa Mann intervened on behalf of those ultrasound students who had paid all of their own tuition without the benefit of government aid. Ms. Mann approached class counsel after the notice had been mailed because she did not understand why people like her were excluded from the class. She was also the sole representative who did not attend the Trevose location. Without her assistance, class counsel would never have been able to file the intervention motion and subsequent renewed motion to certify a mandatory class encompassing the full universe of ultrasound students. Class counsel believes that the latter motion was crucial to achieving the final settlement. In addition, Ms. Mann carefully reviewed the intervener complaint, took time to gather all of her documents relating to the program, and to describe her experiences at UDS to counsel.

In sum, the assistance of these plaintiffs provided the foundation upon which this case was built. They were not in any sense figurehead plaintiffs as is sometimes the case in class action suits. They were active clients. As a result of their having come forward, thousands of passive class members will receive significant benefit from the settlement fund.

## C. Attorneys' Fees

Class counsel jointly request an attorneys' fee of $2,395,241.00, representing one-third of the net settlement, plus one third of the

interest accrued on the fund as of the date of disbursement. Additionally, class counsel seek reimbursement of costs in the amount of $84,277.04. For the following reasons I will grant class counsel's petition.

■■■■■ A thorough judicial review of fee applications is required in all class action settlements. *See In re The Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 333 (3rd Cir.1998) (citations omitted). There are two methods for calculating attorneys' fees, the percentage-of-recovery method and the lodestar method. *See id.* The Third Circuit has explained that "[t]he percentage-of recovery method is generally favored in cases involving a common fund, and is designed to allow courts to award fees from the fund 'in a manner that rewards counsel for success and penalizes it for failure.'" *Id.* (citations omitted). Whereas, "[t]he lodestar method is more commonly applied in statutory fee-shifting cases, and is designed to reward counsel for undertaking socially beneficial litigation in cases where the expected relief has a small enough monetary value that a percentage-of-recovery method would provide inadequate compensation." *Id.* The lodestar method is also "applied in cases where the nature of the recovery does not allow the determination of the settlement's value necessary for application of the percentage-of-recovery method." *Id.* The Third Circuit has stated that "it is sensible for a court to use a second method of fee approval as a cross check." *Id.* (citation omitted). Because this case is a common fund case, I find that the percentage-of-recovery method provides a more appropriate basis for evaluating class counsel's fee petition.

■■■ In applying the percentage-of-recovery method I must begin by making a reasonable estimate of the settlement value. *See id.* at 334. The settlement fund in this case involves cash and forgiveness of debt. There is no question that the $5.97 million in cash is appropriately considered in determining the value of the settlement. The relevant issue is the appropriate value of the $1.3 million in loan forgiveness. Class counsel attach a decision by Judge O'Neill where he awarded attorneys' fees based on a net set-

tlement including cash and debt forgiveness. *See Perod v. McKenzie Check Advance of Pennsylvania, LLC*, No. 98–CV–6787 (E.D. Pa. Order July 6, 2000) (attached as Ex. A to Class Counsel's Pet.). Debt forgiveness for students who are already delinquent in paying back their loans arguably does not have the same value as cash in hand. In addition to the debt forgiveness, however, students credit reports will be cleared of this default. Moreover, the fee sought by class counsel is based solely upon the cash and debt forgiveness and does not include the non-monetary benefits to the class. The non-monetary relief includes appointment of an ombudsman by the court and other remedial measures to provide future students with a better educational experience at UTS. Therefore, I find it reasonable to include debt forgiveness in the total settlement value.

■■■■ In common fund cases courts should consider several factors in setting a fee award:

(1) the size of the fund created and the number of persons benefitted;

(2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel;

(3) the skill and efficiency of the attorneys involved;

(4) the complexity and duration of the litigation;

(5) the risk of nonpayment;

(6) the amount of time devoted to the case by plaintiffs' counsel; and

(7) the awards in similar cases.

*Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 201 n. 6 (3rd Cir.2000). Additionally, the Third Circuit recommends cross-checking percentage award by the lodestar award method. *See id.* The Third Circuit has cautioned that "[t]he eight factors [seven enumerated factors and the lodestar cross-check] listed above need not be applied in a formulaic way. Each case is different, and in certain cases, one factor may outweigh the rest.... what the district court is required to do before reaching such a conclusion is principally to explain way." *Id.* Additionally, "whatever approach district courts choose to

adopt they must safeguard the plaintiffs and class members' interests, because as is often the case (and as it was here), an attorneys' fee motion filed by successful counsel in a common fund award case goes unopposed. Therefore, the plaintiffs' rights need special protection." *Id.* at 201 n. 6.

### 1. The complexity and duration of the litigation [2]

The Third Circuit has instructed district courts that "[t]he complexity and duration of the litigation is the first factor a district court can and should consider in awarding fees." *Id.* at 197–98.

The complexity and duration of this litigation weigh in favor of granting class counsel's petition. A complaint was filed on August 5, 1998. Therefore, this litigation continued for over two years. Because of a multitude of discovery problems I was heavily involved in monitoring this litigation. Virtually nothing about his case was simplistic. Plaintiffs based their complaint on alleged Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1964, violations as well as pendent causes of action for violations of state consumer protection statutes, and for breach of contract and fraud. Numerous discovery motions were filed and I eventually had to make myself available for weekly conferences with the parties, in order to assure that the litigation moved along. This litigation consisted of motions to dismiss, class certification motions, a multitude of discovery motions, many oral arguments and numerous settlement conferences.

The complexity of litigating this case was increased because of few similar cases for counsel to rely on as precedent. As class counsel explains "[n]o reported decision had ever certified a national class against a trade school having more than one location before this Court did so." Class counsel's Mem. in Support of Final Approval of the Proposed Settlement at 33. Class counsel attach an affidavit from a class member, Yehudis Golombeck, describing how she was unable to find any attorney who would bring her case against defendants. *See* App. Decl. in Support of Pet. for Att'ys Fees, Ex. 4. Additionally, this litigation involved fifteen schools in eight states along with voluminous documents. In sum, this case is the paradigm of complex litigation. Both the legal theories and litigation process were complex.

### 2. The size of the fund created and the number of persons benefitted

As class counsel indicates in their petition "[t]he settlement is believed to be the largest recovery ever obtained against a trade school in a civil suit brought by students." Pet. at 1. The class consists of approximately 5,300 people. If every member returns his claim form, this allows for a potential recovery of seventeen percent of total tuition paid per person.[3]

In general, as the size of the settlement fund increases the percentage award decreases. *See In re Prudential Ins.,* 148 F.3d at 339. This case, however, does not involve a settlement award that is so large as to necessitate an automatic reduction in the percentage award. *See Gunter,* 223 F.3d 190, 191–92, 201 n. 6 ($9.5 million settlement is not considered "extremely large" and is a "mainstream case."). The size of the fund and the number of people, in addition to the monetary amount each class member will recover, militates in favor of approving this fee petition.

### 3. The presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel

Class members were alerted through the class notice that attorneys' fees may amount to as much as one-third of the gross settlement fund (cash and debt relief). Out of the over 5,250 class members that

---

2. While the complexity and duration of the litigation is listed as the fourth factor for consideration in footnote 1 of the Third Circuit's opinion in *Gunter,* the text of the opinion indicates that this factor should be considered first. *See Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190, 198–99, 201 n. 6 (3rd Cir.2000).

3. This percentage as high as approximately 20% depending upon how many members actually file claims. To date, approximately 2,000 members have filed claims.

received the notice, there was only one objector. Therefore, this factor weighs in favor of approving the fee petition.

### 4. The skill and efficiency of the attorneys involved

▮ As class counsel notes "[t]he single clearest factor reflecting the quality of class counsels' services to the class are the results obtained. The class will receive the largest recovery ever obtained against a trade school." Pet. at 11–12. The skill and expertise of class counsel allowed for a substantial settlement. Howard Langer, Esq., co-lead counsel for the class, is a partner with Sandals, Langer & Taylor. Sandals, Langer & Taylor, as well as Mr. Langer himself, has extensive experience in class actions. *See* App. of Decl. Langer at Ex. C. Mr. Langer was lead counsel in *Robinson v. Countrywide Credit Industries*, No. 97–2747, 1997 WL 634502 (E.D.Pa. Oct.8, 1997), and *In re Marine Midland Motor Vehicle Leasing Litigation*, 155 F.R.D. 416 (N.D.N.Y.1994). Mr. Langer was also co-lead counsel in *In re Carbon Dioxide Antitrust Litigation*, 149 F.R.D. 229 (M.D.Fla.1993), and is currently co-lead counsel in *In re Commercial Tissue Products Antitrust Litigation*, 183 F.R.D. 589, 595 (N.D.Fla.1998). *See id.* Mr. Langer was assisted by attorneys from his own firm (Ms. Kay Sickles, Esq., Ms. Melinda deLisle, Esq. and Mr. Scott Lempert, Esq.) as well as Mr. Ruben Honik, Esq. and Ms. Roberta Liebenberg, Esq. Both Mr. Honik and Ms. Liebenberg also provided declarations and descriptions of their practices. *See* App. Decl. in Support of Pet. for Att'ys Fees. The skill of each of these attorneys is reflected both in settlement and in the aggressive manner in which they pursued this litigation from start to finish. As class counsel notes, at one conference, I stated the following, in reference to Mr. Langer: "[I]t seems to me, that you may have to . . . go the extra step and it seems to me that if there's anyone who is . . . going to be able to do that, you will be able to do it . . . you go after it and you don't let it go . . .". Pet. at 21 (quoting Tr. Jan. 20, 2000 at 22). In sum, the highly skilled class counsel provided excellent representation both for named plaintiffs and absent class members.

▮ In each of their declarations, class counsel provided a total of the amount of hours they worked on this litigation. Given the complexity of the case and the number of motions filed, I find that the time counsel spent on this case is a demonstration of their efficiency. Additionally, the fact that this case settled as opposed to proceeding to trial "in and of itself, is never a factor that the district court should rely upon to reduce a fee award. To utilize such a factor would penalize efficient counsel, encourage costly litigation, and potentially discourage able lawyers from taking such cases." *Gunter*, 223 F.3d 190, 197–98. Therefore, I find that the skill and efficiency of counsel militate in favor of approving class counsel's petition.

### 5. The risk of nonpayment

▮ The risk of nonpayment in this case was acute. The settlement represented more than Whitman Medical Corporation's total profits over the past five years. *See* Mem. in Support of Final Approval of the Proposed Settlement at 23. Whitman lacked significant unencumbered hard assets against which plaintiffs could levy had a judgment been obtained. *See id.* Additionally, Whitman represented to the Court that the amount it was contributing to the settlement was the maximum it could contribute without violating the Secretary of Education's financial responsibility regulations under Title IV. *See id.* at 24.

Whitman had two relevant insurance carriers. Both policies excluded coverage for deliberate acts. *See id.* Additionally, one of the insurance carriers claimed that Whitman had failed to disclose pending litigation when applying for insurance coverage. *See id.* at 25. The other insurance policy was a wasting policy meaning a maximum amount was allocated for coverage regardless of whether the case proceeded or settled. *See id.* In sum, Whitman's insurance carriers had a multitude of defenses and the risk that the wasting policy would run out by the time a trial was over added further concern to the potential for recovery.

### 6. The amount of time devoted to the case by plaintiffs' counsel

▮ In class counsel's declarations they provide summaries of the amount of time

spent on this litigation. Mr. Langer leads the group of attorneys with 1,573.2 hours. In total, class counsel afforded 3,899.84 hours to this litigation. The time class counsel devoted to this case represents a substantial commitment to this litigation.

### 7. The awards in similar cases

■ As described above, this was the first case certifying a system-wide class action against a trade school. I looked to other attorneys' fee awards in class actions in this district to determine the reasonableness of class counsel's request. As class counsel describe, the award of one-third of the fund for attorneys' fees is consistent with fee awards in a number of recent decisions within this district. *See* Pet. at 9. For example, in *Perod*, Judge O'Neill award one-third of the settlement fund for attorneys' fees. *See* No. 98–CV–6787. *Perod* was a class action brought against a check-cashing company alleging violations of the Truth in Lending Act, RICO, Pennsylvania's Loan Interest and Protection Law, Pennsylvania's Unfair Trade Practices and Consumer Protection Law, and Pennsylvania common law prohibiting fraud. Class counsel also attaches to their petition an exhibit listing cases where courts have awarded attorneys' fees of 33⅓% or more from the recovery achieved. *See id.* Ex. C. Therefore, I conclude that an award of one-third of the settlement fund is reasonable in consideration of other courts' awards.

### 8. Lodestar cross-checking

■ The lodestar is determined "by multiplying the number of hours counsel reasonably worked on a client's case by a reasonable hourly billing rate for such services in a given geographic area provided by a lawyer of comparable experience." [4] *Gunter*, 223 F.3d at 198–99. The Third Circuit explained that "[t]o examine the lodestar factor

properly, a Court should make explicit findings about how much time counsel reasonably devoted to a given matter, and what a reasonable hourly fee would be for such service." *Id.* at 199–200. In explaining lodestar multipliers the Third Circuit reasoned that "[m]ultipliers may reflect the risks of nonrecovery facing counsel, may serve as an incentive for counsel to undertake socially beneficial litigation, or may reward counsel for extraordinary result. By nature they are discretionary and not susceptible to objective calculation." *In re Prudential Ins.*, 148 F.3d at 340. The Third Circuit has also recognized that "multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied." *Id.* at 341 (quoting 3 H. Newberg & A. Conte, NEWBERG ON CLASS ACTIONS, § 14.03 at 14–5).

■ The multiplier in this case is 2.04.[5] The declarations of class counsel provide an account of the number of hours counsel worked on this litigation and counsel's hourly rates. For example, Mr. Langer attributes 1,573.2 hours to this litigation and his hourly rate is $390. Mr. Langer and members of his firm worked a total of 2,751.9 hours on this litigation, reaching a sum of $810,418.00. Mr. Honik and others with his firm accounted for 973.7 hours totaling $314,562.50. Finally, Ms. Liebenberg, along with another attorney and a paralegal calculated 174.24 hours for a total cost of $48,798.75. In sum, class counsel dedicated 3,899.84 hours to this litigation. The total number of hours multiplied by the various attorneys' and paralegals' rates equals $1,173,779.25. Resulting in a lodestar multiplier of 2.04.[6] I find that given the stage of this litigation and the numerous motions, conferences, and oral arguments that preceded settlement, 3,899.84 hours dispersed over eleven attorneys and four paralegals is reasonable.[7] I also find

---

4. *See* affidavit of Alan Black and Arlin M. Adams submitted by plaintiff, testifying to the reasonableness of the rates charged by class counsel based on the hourly rates of lawyers of similar skill and experience in the Philadelphia area.

5. In calculating the loadstar multiplier class counsel used their historic rates over the course of the litigation, instead of counsel's current rates.

6. The loadstar multiplier is calculated by dividing the attorneys' fees class counsel seek by the total amount of hours class counsel expended on the litigation times class counsel's hourly rates.

7. It should also be noted that prior to granting preliminary approval of the settlement agreement, I required numerous re-drafts of the agreement and insisted upon greater and greater specificity.

that counsel charge reasonable hourly fees.[8]

■ There is ample reason to apply a multiplier of 2.04 in this case. First, class counsel achieved an extremely favorable settlement for the class. Class members will receive cash and/or debt forgiveness in addition to non-monetary relief that will impact future students of UTS. Second, this case was risky because of the lack of similar cases and the chance of no recovery. Third, counsel engaged in almost two years of arduous arms-length litigation.[9] Additionally, this litigation has social value. UTS schools in numerous states will be required to reform their practices to comply with this settlement agreement. Finally, multipliers ranging from one to four are frequently awarded. Given the years spent on this litigation, the skill of class counsel and the favorable result achieved for class members I find that a multiplier of 2.04 is reasonable.

### D. Costs

Class counsel has also requested reimbursement of litigation costs in the amount of $84,277.04. A non-exhaustive list of these expenses includes: copying, expert witnesses, transcripts, depositions fees, on-line research, travel and meals, postage and delivery services, subpoena service and witness fees and telephone. A large percentage of these litigation costs are attributable to copying and expert witness costs. I find these expenses to be adequately documented, proper and reasonable. *See* App. of Decl. in Support of the Pet. for Att'ys Fees. Therefore, I will award counsel a reimbursement of these expenses from the gross amount of the settlement Fund.

### E. Conclusion

For all of the foregoing reasons, I will grant class counsel's petition for final approval of the settlement agreement, for incentive awards for class representatives and persons

---

**8.** *See* affidavit of Arlin M. Adams.

**9.** The complaint was filed in August, 1998 and a settlement sum was reached on May 4, 2000. For weeks after May 4, 2000, however, the parties continued to negotiate the non-monetary

---

initiating the suit, and for attorneys' fees and costs.

### SETTLEMENT APPROVAL ORDER AND FINAL JUDGMENT

1. On July 21, 2000, the Settlement Agreement and Proposed Plan of Distribution were preliminarily approved.

2. Notice of the settlement was mailed by first class mail to all known potential members of the Class on July 25, 2000 pursuant to the terms of the Preliminary Approval Order.

3. A hearing was held on September 15, 2000, at which time the parties and all other interested persons were heard in support of and in opposition to the proposed settlement. I offered to consider any written comments submitted to the Clerk of the Court by absent members of the Class, but none were submitted.

4. Based on the papers filed and the presentations made to the Court by the parties and by other interested persons at the hearing, it appears to the Court that the Settlement Agreement is fair, adequate, and reasonable.

5. The Court has jurisdiction over the subject matter of this litigation and over all parties to this litigation, including all Class members, as defined in the Court's Order of June 22, 2000.

6. The Class Representatives, Susan E. Cullen, Mary Beth Phelps, Monica Davis, Melissa Mann and Kelly Smith, adequately represent the Class.

7. The notice of the settlement mailed first class postage prepaid to all known potential members of the Class as defined in the Order of June 22, 2000, fully and accurately informed potential members of the Class of all material elements of the proposed settlement and constituted valid, due, and sufficient notice to all potential members of the Class.

---

terms of the settlement. Additionally, class counsel filed several versions of the proposed settlement and supporting documents before I preliminarily approved of the settlement in July, 2000.

8. The persons who in response to the notice of certification filed timely and valid requests for exclusion from the Class and who are not bound by this Settlement Approval Order and Final Judgment are attached in Exhibit 1.[10]

9. The sums requested for attorneys' fees and costs are fair and reasonable.

10. The sums requested for incentive awards are fair and reasonable.

It is **ORDERED AND DECREED:**

1. Pursuant to Rule 23(e), Fed.R.Civ.P., the Settlement Agreement and the proposed Plans of Allocation (attached as Exhibit 2) and the terms of the settlement as described in the Settlement Agreement, are approved and confirmed as being fair, reasonable and adequate to all Class members. The parties and their counsel are directed to implement the Settlement Agreement and Plans of Allocation in accordance with their terms.

2. The Amended Class Action Complaint and the Intervenor Complaints of Melissa Mann and Kelly Smith, and all claims and causes of action asserted, are dismissed with prejudice, as to the Class representatives and all members of the Class. These dismissals are without cost to any party, except as specifically provided in the Settlement Agreement.

3. As of the Effective Date set forth in the Settlement Agreement, the Class representatives and all members of the Class who did not request exclusion shall, to the extent permitted by law, conclusively be deemed to have fully, finally and forever released, acquitted and discharged the defendants (as that term is used in the Settlement Agreement) and all persons and entities from any and all settled claims and causes of action to the extent provided in the Settlement Agreement.

4. To the extent permitted by law, any Class member who did not request exclusion is barred and permanently enjoined from asserting, instituting, or prosecuting, either directly, indirectly, individually, or in a representative or derivative capacity, the released claims, as set forth in the Settlement Agreement.

5. Without affecting the finality of this Settlement Approval Order and Final Judgment in any way, the Court retains exclusive jurisdiction over implementation, enforcement and performance of the Settlement Agreement.

6. Anne Markey Jones, as ombudsman, shall report to the court annually, in accordance with the terms of the Settlement Agreement.

7. This Order and Final Judgment is not a finding of the validity or invalidity of any claims in this action nor a determination of any wrongdoing by the defendants.

8. The following attorneys' fees and costs are awarded:

| Attorneys' fees: | $2,395,241.00 |
|---|---|
| Costs: | $ 84,277.04 |

These awards should include 41.5% of the interest earned on the settlement fund up to the date of disbursement of the fee to counsel.[11] Counsel for plaintiffs may petition for award of additional fees and reimbursement of expenses relating to the consummation and administration of the settlement. Such supplemental petitions may be made without notice to the Class.

The award of fees and costs shall be distributed to the firm of Sandals & Langer, LLP for allocation among plaintiffs' counsel. The Court reserves jurisdiction over the fees and costs in the event agreement cannot be reached among plaintiffs' counsel on allocation of the fees.

13. The following incentive awards are granted:

---

10. A significant number of individuals selected to opt-out of this action when the class was first certified in December, 1999. These individuals listed in Exhibit 1 are not bound by this Order and Final Judgment. In contrast, no members of the class selected to opt out of the Settlement Agreement. [**Editor's Note:** Exhibit 1 deleted for purposes of publication.]

11. This percentage represents the total combined attorneys' fees and costs ($2,479,518.04) divided by $5.97 million, that portion of the settlement fund in cash that has been invested.

| | |
|---|---|
| Susan Cullen: | $10,000.00 |
| Mary Beth Phelps: | $10,413.50 |
| Monica Davis: | $ 1,939.75 |
| Melissa Mann: | $10,599.03 |
| Kelly Smith: | $ 9,701.03 |
| Ruth A. Dillon: | $10,000.00 |
| Deborah L. Dougherty: | $10,000.00 |

14. The Clerk of the Court is directed to enter this Memorandum, Order, and Final Judgment as a final judgment with respect to each Plaintiff and Class member. The Court's reservation of continuing jurisdiction pursuant to the preceding paragraph shall not affect in any way the finality of this Order and Final Judgment.

## STIPULATION AND AGREEMENT TO SETTLE AND DISMISS PLAINTIFFS' CLAIMS

This Settlement Agreement ("Agreement") is made and entered into this 22nd day of June, 2000 (the "Execution Date"), memorializing agreements reached by the parties and recited on the record before the Court on May 4, 2000, by and between Defendants and their insurers and Plaintiff class representatives, including additional intervenor class representatives Melissa Mann and Kelly Smith ("Plaintiffs"), both individually and on behalf of a class of students of the Ultrasound Diagnostic Schools.

WHEREAS, Plaintiffs in this action are former students of the general ultrasound and non-invasive cardiovascular technology programs at the Ultrasound Diagnostic Schools;

WHEREAS, Plaintiffs Susan E. Cullen, Mary Beth Phelps and Monica Davis and intervenor Plaintiffs Melissa Mann and Kelly Smith (collectively "Plaintiffs"), following individual suits brought by five other students of the Ultrasound Diagnostic School, commenced this action individually and on behalf of a class of students who attended the Ultrasound Diagnostic School between August 1, 1994 and August 1, 1998, against Defendants Whitman Medical Corporation d/b/a Whitman Education Group, Inc., Ultrasound Technical Services, Phillip Frost; Richard C. Pfenniger, Jr.; Randy Proto, Fernando L. Fernandez, Richard B. Salzman, Joseph Lichtenstein, Milton Gallant, and William Speir (collectively "Defendants"), for alleged viola-

tions of the RICO Act, 18 U.S.C. § 1961 *et seq.*, breach of contract, violation of state consumer protection statutes and fraud (hereinafter the "Civil Action");

WHEREAS, Plaintiffs had moved to file an amended complaint which, inter alia, included a claim for negligent misrepresentation and which was pending before the Court at the time of settlement;

WHEREAS, on November 12, 1999, the Court entered an Order certifying a class pursuant to Fed.R.Civ.P. 23(b)(3) in accordance with the following class definition:

All persons who attended the UDS Diagnostic Medical Ultrasound program at any time during the period of August 1, 1994 through August 1, 1998 and who also received federally guaranteed student loans or other federally financed financial aid, at any time, to pay for attending the program during this period.

WHEREAS, on February 16, 2000, Melissa Mann had filed a motion to intervene and amend the class definition to include all persons who attended the UDS Diagnostic Medical Ultrasound Program during the period of August 1, 1994 through August 1, 1998, and who did not receive federally funded guaranteed student loans or federally financed financial aid to pay for attending the program ("Intervenor Class") and which was pending before the Court at the time of settlement;

WHEREAS, Defendants filed an Answer denying all material allegations in the Civil Action and have interposed affirmative defenses, and continue to deny any and all allegations asserted by Plaintiffs;

WHEREAS, on June 13, 2000, Kelley Smith intervened and filed a complaint on behalf of a class to include all persons who attended the Ultrasound Diagnostic School Non–Invasive Cardiovascular Program during the period August 1, 1994 through August 1, 1998;

WHEREAS, Class Counsel, acting on behalf of Plaintiffs and the Class, while continuing to maintain the strength of their claims, deem it to be advantageous to compromise the claims asserted on behalf of Plaintiffs and

the Class upon the terms set forth below; and

WHEREAS, Defendants, while denying all liability for the claims and charges made in the Civil Action, and without admitting or conceding any fault or liability whatsoever, and without conceding any infirmity in their defenses against the Civil Action, have concluded that further conduct of the litigation would be protracted and expensive and that it is desirable that the litigation be fully and finally settled in the manner and upon the terms and conditions set forth in this Agreement to limit further expenses, inconvenience and to dispose of burdensome and protracted litigation.

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED, by and among Plaintiffs and the Class and Defendants, subject to the approval of the Court pursuant to the procedures mandated by Fed.R.Civ.P. 23, as follows:

### DEFINITIONS

The following terms, as used in this Agreement, have the following meanings:

1. For purposes of the mutual release provisions of this Agreement and the Order and Final Judgment, "Defendants" shall refer jointly and severally, and individually and collectively to Whitman Education Group, Inc., Ultrasound Technical Services, Inc., Phillip Frost, Richard C. Pfenniger, Jr., Randy Proto, Fernando L. Fernandez, Richard B. Salzman, Joseph Lichtenstein, Milton Gallant, and William Speir. With regard to the releases furnished to Whitman Education Group, Inc. and Ultrasound Technical Services, Inc., "Defendants" shall refer as well to the past and present officers, directors, employees, agents, attorneys, servants, representatives, parents, subsidiaries, affiliates, partners, insurers, reinsurers and co-insurers and to all other persons, partnerships, or corporations with whom any of the former have been, or are now, affiliated and to the predecessors, successors, heirs, executors, administrators, and assigns of each of the foregoing.

2. "Class Period" means the period from and including August 1, 1994 up to and including August 1, 1998.

3. "Settlement Fund" shall be all the cash amounts paid by Defendants and their insurers in settlement of the action, including any interest accrued on those amounts.

4. "Class Counsel" means the law firms of Sandals, Langer & Taylor, LLP; Golomb & Honik, PC; and Liebenberg & White.

5. "Final Order" means the Order and Final Judgment subject to approval by the Court.

6. "Effective Date" means the date on which the Court's approval of this Stipulation and Agreement becomes final. This Stipulation and Agreement shall become final upon such date as the Final Order shall have been entered and the applicable period for any appeal from the Final Order has expired without the filing or perfecting of such appeal, or, if an appeal is taken, upon entry by a final appellate court of an order dismissing the appeal or affirming the Final Order, or upon the expiration or other termination of any right of further appeal, or upon the voluntary or involuntary dismissal or withdrawal of any such appeal (whether or not there remains any time for any other Class Member to seek to perfect or further pursue an appeal);

7. "Class" or "Class Member(s)" means those persons encompassed within the definition of the Class defined by the Court in its Order of November 12, 1999, and any amendments to that definition, excluding all persons who opt-out of said Class. A list of the persons who opted out of the Class in response to the initial notice is attached hereto as Exhibit A.

8. The Class shall be divided into two subclasses as follows:

   a. All persons who attended the UDS Diagnostic Medical General Ultrasound program at any time during the period of August 1, 1994 through August 1, 1998 (the "GUS subclass").

   b. All persons who attended the UDS Non-invasive Cardiovascular Technology program (hereinafter "the cardiovascular technology program") at any time during

the period of August 1, 1994 through August 1, 1998 ("CVT subclass")

## II. PRELIMINARY ORDER AND NOTICE

9. On or before June 22, 2000, Plaintiffs shall submit to the Court a motion to amend the class definition to include the subclasses set forth in paragraph 8. A separate motion shall also request preliminary approval of the settlement; authorization to disseminate Notice of such amended certification of the Class, of the settlement, and of the final judgment contemplated by this Agreement to all potential Class Members; and for a stay of all proceedings in the Civil Action against Defendants, except for proceedings provided for in or in connection with this Agreement as set forth herein, until the Court's ruling on the fairness and adequacy of the Settlement. The motion for preliminary approval shall include: (i) a proposed form of, method for, and date of dissemination of notice and claim forms to the Class; and (ii) a proposed form of final judgment order. The text of the items referred to in clauses (i) and (ii) above shall be agreed upon by Plaintiffs and Defendants before submission of the motion. In the event the parties are unable to reach agreement on the texts of items (i) and (ii)above, said items may be determined and entered by the Court based on submissions by the parties and oral argument, if any. Individual notice of the settlement and claim forms shall be mailed to persons already mailed notice pursuant to the Orders of December 22, 1999 and January 20, 2000. Separate forms of notice shall be sent to the Class defined in the Court's Order of November 12, 1999, and to the intervenor class and the CVT subclass. The notices to members of the intervenor class and the CVT subclass shall advise them of the settlement, the settlement classes and their rights pursuant to Rule 23(b)(3), including their right to opt-out.

## III. FINAL ORDER

10. The proposed Final Order shall provide for the following:

a. Approval of the settlement of the claims asserted or that could have been asserted in this Civil Action arising, in whole or in substantial part, from the facts asserted in this case, including the proposed Plans of Allocation and any incentive awards, if any, awarded to the individual and representative Plaintiffs, adjudging the settlement to be fair, reasonable and adequate, directing consummation of the terms and provisions of the Settlement Agreement and requiring the parties to take the necessary steps to effectuate their terms and provisions;

b. Dismissal with prejudice of the claims of Plaintiffs and the Class in the Civil Action, whether asserted directly, individually or in a representative or derivative capacity, and without additional costs or expenses to any party other than as provided for in this Settlement Agreement;

c. A list of all members of the Class who have timely opted out of the Class;

d. To the extent permitted by law, permanently barring and enjoining each and every Class Member who has not opted out of the Class from asserting, either directly, individually, or in a representative or derivative capacity, any Released Claim against any of the Released Persons;

e. The parties' submission to, and the Court's continuing retention of, exclusive jurisdiction over this matter for the purposes of effectuating and supervising the enforcement, interpretation or implementation of this settlement and the judgment entered thereon, and resolving any disputes that may arise hereunder;

f. On the Effective Date all Class Members who have not opted out of the class shall be bound by this Stipulation and Agreement and by the Final Order.

## IV. TERMS OF SETTLEMENT

11. In full, complete and final settlement of the claims asserted or that could have been asserted in the Civil Action arising in whole or in substantial part from the facts asserted in this case, and subject to the satisfaction of all the terms and conditions of this Stipulation and Agreement, the parties shall comply with the following provisions:

**A. Cash Payment:** Defendants and their insurers shall pay the sum of five

million nine hundred and seventy thousand dollars ($5,970,000) to the Class. Said sum has been deposited to an account at the PNC Bank entitled the Whitman Litigation Settlement Account, Heffler, Radetich, Saitta, LLP, Escrow Agent. Defendants' insurers, Zurich Insurance Company and National Union Fire Insurance Company, are expressly made parties to this section of the Agreement. The five million nine hundred and seventy thousand dollars is allocated among the Defendants and their insurers as set forth below and Defendants' insurers agree to be bound to the terms and conditions of this paragraph as parties to this paragraph of this Agreement:

(i) Zurich Insurance Company: two million four hundred thousand dollars ($2,400,000.00)

(ii) National Union Fire Insurance Company of Pittsburgh, PA: two million four hundred thousand dollars ($2,400,000.00)

(iii) Whitman Education Group: one million one hundred and seventy thousand dollars ($1,170,000.00).

(iv) In the event the Court does not enter an Order providing for preliminary approval of the Agreement before August 7, 2000, that portion of the settlement fund provided by the insurers, plus any interest accrued, shall be returned to the respective insurers to hold in escrow on behalf of the Class, in accounts bearing no less interest than the rate on ninety (90) day Treasury Bills on the day on which such sums are returned, until such time as an Order providing for preliminary approval or providing for the mailing of notice of the settlement to the Class is entered. The insurers shall wire the funds back to the escrow account into which they were deposited pursuant to paragraph 11(a) below within three (3) days of entry of such Order.

**B. Forgiveness of Obligation:** Whitman and/or Ultrasound Technical Services, Inc. have agreed to forgive one million three hundred forty six thousand seven hundred and forty six dollars ($1,346,746) in specified outstanding sums owed by students in the GUS and CVT subclasses (less such specified sums owed by persons who opt out of the class). Whitman shall provide a list of each student eligible to receive such forgiveness within ten (10) days of the signing of this Agreement.

(i) Within fifteen (15) days after the opt out period has expired, the Settlement Administrator shall provide (in hard copy and electronic format) Nihill & Riedley, P.C. with an updated list of the Class Members reflecting any corrected or subsequent address information, as well as a list of those persons who opted out of the Class. Within fifteen (15) days after the Effective Date:

a. Defendants Whitman and/or UTS shall mail to each student in the Class who does not opt out, regardless as to whether or not such student files a claim in this action, an accord and satisfaction for the unpaid balance of such sums.

b. Defendants Whitman and/or UTS shall notify any and all credit bureaus and collection agencies to which such delinquency was reported of such accord and satisfaction and request that they remove any record of the delinquency and shall provide a copy to Class Counsel Howard Langer.

c. Defendants Whitman and/or UTS shall furnish Class Counsel with an accounting certified by Nihill & Riedley, P.C. listing for each member of the Class the amount of the delinquency forgiven pursuant to this provision.

d. Defendants Whitman and/or UTS shall file copies of each accord and satisfaction under seal with the Court and provide a copy to Class Counsel Howard Langer.

C. Undertakings with Regard to Future Conduct: Defendants Whitman Education Group, Inc. and Ultrasound Technical Services, Inc. agree to the following undertakings as terms under this Agreement and agree to the continuing jurisdiction of the Court for a period of four years following the Effective Date to enforce these undertakings: (i)

Admissions Practices:

(a) Defendant Ultrasound Technical Services, Inc. or any successor corporation to Ultrasound Technical Services, Inc. owned by Whitman providing programs in either general ultrasound or non-invasive cardiovascular technology (hereinafter collectively referred to as "UTS") agrees to maintain admissions procedures and requirements for general ultrasound or non-invasive cardiovascular technology programs and to adhere to said procedures and requirements. The two versions of the existing procedures and requirements are set forth on Exhibit B hereto, either of which may be used. UTS may make reasonable changes to its procedures and requirements during the four-year period upon prior notice to the Court. However UTS may make changes to its procedures and requirements as required by federal or state regulators or applicable accrediting bodies without such notice.

(ii) Appointment of Ombudsman:

(a) The Court shall appoint a neutral ombudsman who shall report to the Court annually, in writing, sixty days prior to the anniversary of the Effective Date, regarding UTS's adherence to its admissions requirements in its actual admissions of students in the general ultrasound or non-invasive cardiovascular technology programs. Copies of the annual report shall be served on each Counsel for the Class and counsel for Defendants.

A. The ombudsman shall receive from UTS or their relevant subsidiary, if any, their admissions reports for the general ultrasound or non-invasive cardiovascular technology programs, including their accreditation admissions information, internal investigations related to admissions, any other internal reports related to admissions, and the ombudsman shall have reasonable access to any other admissions records reasonably necessary to prepare the report to the Court.

B. UTS shall be responsible to pay the fees of the ombudsman not to exceed $125 per hour and the documented, reasonable out-of-pocket costs of the ombudsman. The compensation of the ombudsman shall be that customarily paid to a person engaged in the field in which the ombudsman is employed or trained. It is contemplated that the ombudsman shall not be a full-time employee but shall be employed as a consultant reporting to the Court and shall only incur so much time as is necessary to prepare the annual report to the Court.

C. In the event a program in general ultrasound or non-invasive cardiovascular technology at a location of UTS' school is accredited by the Commission on Accreditation of Allied Health Education Programs ("CAAHEP") during the four year period, the ombudsman shall not report to the Court regarding the accredited program at the location accredited, but shall report on the general ultrasound or non-invasive cardiovascular technology programs not accredited at that location and shall report on the general ultrasound or non-invasive cardiovascular technology programs at all other locations. In short, accreditation of a program under this section relates solely to the program accredited at the site accredited.

(iii) Faculty:

A. All UTS faculty in the general ultrasound program shall be registered with the American Registry of Diagnostic Medical Sonographers ("ARDMS") or be eligible upon hiring for such registration. All UTS faculty in the non-invasive cardiovascular technology program shall be registered with the Cardiovascular Credentialing

International ("CCI") or ARDMS or be eligible upon hiring for such registration. If the faculty member is eligible for such registration or certification but does not receive registration or accreditation within six months of hire, the instructor will be promptly terminated.

(iv) Entrance Examinations:

A. Any employee furnishing assistance, other than purely ministerial assistance, to a general ultrasound or non-invasive cardiovascular program applicant on an entrance examination will be promptly terminated.

B. UTS will not administer the same entrance examination (or a different module or version of that examination) to a general ultrasound or non-invasive cardiovascular applicant within thirty days of its initial administration of the examination to that applicant. UTS may, however, administer a different examination to that applicant within that thirty-day period.

C. Any employee administering the same entrance examination to a general ultrasound or non-invasive cardiovascular program applicant within thirty days of the applicant taking the examination will be promptly terminated.

D. In the event a general ultrasound or non-invasive cardiovascular program applicant admitted as a student was administered the same entrance examination within thirty days, the student may be retested using a different entrance examination. If the student passes, the student may remain in the program. If the student does not pass, the student shall be removed from the program and provided with a full refund.

(v) Disclosures. Subject to any federal or state regulatory or applicable accrediting agency requirements:

A. UTS shall maintain its current form of statistical disclosure for the general ultrasound and non-invasive cardiovascular programs, updated at least semi-annually, an example of which is attached hereto as Exhibit C; however, such disclosure shall be amended to include the pass rates of students at that location on the ARDMS registry examination, in the case of applicants to the general ultrasound program, and on the Cardiovascular Credentialing International ("CCI") or ARDMS examination in the case of applicants to the non-invasive cardiovascular program or both, as applicable. The parties will endeavor to agree upon an appropriate form of such disclosure. In the event they are unable to do so, the form of disclosure shall be determined by the Court.

(vi) Cooling-off period: Subject to any approval required by applicable federal or state agencies or accrediting body which approval will be sought within 90 days of the Effective Date:.

A. Students admitted to either the general ultrasound or non-invasive cardiovascular program shall have the greater of two weeks following admission or one week from the first actual day of the class in which the student had enrolled to withdraw from the program and receive a full refund, and may at that time also withdraw any application for financial aid. Disclosure of such policy shall be in bold print on the application form.

B. Applicants to either the general ultrasound or non-invasive cardiovascular program will not be permitted to submit a financial aid application to the school on the day on which they apply to the school. However, applicants can be furnished with the necessary

financial aid applications at the time of the interview.

The above undertakings are in addition to any applicable federal, state or accrediting agency requirements. These undertakings are not, and defendants shall not represent such undertakings to be, in lieu of federal, state or accrediting agency requirements. Nothing in these undertakings shall require defendants to violate any federal, state or accrediting agency requirement. Nothing express or implied in these undertakings shall be construed as an admission or concession by defendants that Whitman or UTS are not in compliance with applicable federal, state or accrediting agency requirements. Compliance with the above undertakings do not confer any immunity upon the defendants and are not intended to represent a determination by the parties or the Court of the quality or adequacy of defendants' procedures.

## V. RELEASE

12(a) In consideration for the obligations and commitments undertaken by Defendants which constitute good and valuable consideration, and upon approval by the Court of this Stipulation and Agreement and the occurrence of the Effective Date, Plaintiffs and all Class Members other than those who have opted out of the Class shall be deemed to have fully, finally and forever, released, acquitted and discharged Defendants and each of their predecessors, successors, past and present officers, directors, trustees, partners, employees, agents, attorneys, accountants, insurers, co-insurers, reinsurers, parents, affiliates and subsidiary companies, and the assigns and heirs of each of them (hereinafter collectively referred to as the "Released Persons") from any and all claims and causes of action whatsoever at law or equity, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden which could have been asserted, have been asserted, or are now pending on behalf of any Plaintiff or Class Member arising in whole or substantial part from the facts which Plaintiffs or the Class have asserted in this case, including all such claims any Class Members have raised or might have raised now or in the future:

A. under state or federal statutes, laws, rules or regulations, including but not limited to claims arising under RICO;

B. under state or federal common law, including but not limited to claims of breach of contract, fraud, negligence, breach of any duty, law or rule, violation of state consumer protection statutes, or negligent misrepresentation.

(All of the foregoing defined as "Released Claims").

This release shall not encompass or be deemed to impair any claims that may arise out of the implementation of this Stipulation and Agreement

(b) Plaintiffs and Class members who do not opt out, and their attorneys, shall be completely released, acquitted, and forever discharged from any and all claims, demands, actions, suits and causes of action, whether class, individual or otherwise in nature, that the Defendants ever had, now have, or hereafter can, shall, or may have on account of, or in any way arising out of, any and all known and unknown, foreseen and unforeseen, suspected or unsuspected injuries or damages, and the consequences thereof, in any way arising out of or resulting from their attendance at Defendants' schools or prosecution of this lawsuit from the beginning of time to the date of this Agreement. This release shall not apply in any way to any federally or state guaranteed student loan obligation outstanding or any obligation owed to a third-party lending institution, or to any amount owed by any class member to any Defendant and not forgiven pursuant to paragraph 11.B.

This release shall not encompass or be deemed to impair any claims that may arise out of the implementation of this Stipulation and Agreement.

## VI. GENERAL PROVISIONS

13. This Agreement shall become final only when (i) the Court has entered a final order approving this Agreement under Rule 23(e) of the Federal Rules of Civil Procedure and a final judgment dismissing the Action against Defendants on the merits with preju-

dice as to all Plaintiffs and Class Members and without costs, and (ii) the time for appeal or to seek permission to appeal from the Court's approval of this Agreement and entry of a final judgment as described in clause (i) above has expired or, if appealed, approval of this Agreement and the final judgment have been affirmed in their entirety by the Court of last resort to which such appeal has been taken and such affirmance has become no longer subject to further appeal or review ("Finally Approved"). It is agreed that neither the provisions of Rule 60 of the Federal Rules of Civil Procedure nor the All Writs Act, 28 U.S.C. § 1651, shall be taken into account in determining the above-stated times. On the date that Plaintiffs and Defendants have executed this Agreement, Plaintiffs and Defendants shall be bound by its terms, and this Agreement shall not be rescinded except in accordance with paragraphs 18 and 19, *infra*, of this Agreement.

14. After the Court has preliminarily approved this Agreement and before the Court issues a final order approving this Agreement, disbursements limited to expenses associated with providing notice of the settlement to the Class, payment of taxes arising with respect to income earned by the Settlement Fund (including, without limitation, expenses of a tax attorney or consultant and mailing and distribution costs and expenses relating to filing or failing to file), and expenses associated with administering the Settlement Fund and the settlement, all as approved by the Court, may be made from the Settlement Fund, and only those amounts described in this paragraph shall not be refundable to Defendants or their insurers in the event the Agreement is disapproved, voided, or otherwise fails to become final. These disbursements shall not include any payments to Class Counsel.

15. The Settlement Fund shall be invested in obligations guaranteed by the United States Government or its agencies or in a mutual fund investing solely in obligations guaranteed by the United States Government or its agencies (provided, however, that such portions of the Settlement Fund as may reasonably be needed to pay current expenses associated with providing notice to the Class, administering the Settlement Fund and the settlement may be deposited in a federally insured bank account in the Bank in an amount not exceeding $100,000). Interest on the Settlement Fund will accrue to the Class and remain part of the Settlement Fund, subject to the provisions of paragraphs 18 and 19, *infra.*

16. After the Court's approval of this Agreement becomes final (the "Effective Date"), the Settlement Fund shall be distributed in accordance with the plan of allocation that Class Counsel shall submit at the appropriate time for approval by the Court at the time of Final Approval. In no event shall Defendants or their insurers have any responsibility, financial obligation, or liability whatsoever with respect to the investment, distribution, or administration of the Settlement Fund, including, but not limited to, the costs and expenses of such distribution and administration, except as expressly otherwise provided in this Agreement.

17. After the Effective Date, Plaintiffs and Class Counsel shall be reimbursed and indemnified out of the Settlement Fund for all expenses including, but not limited to, attorneys' fees and expenses and the costs of giving notice of this settlement to Class Members. Defendants and their insurers shall not be liable for any costs, fees, or expenses of any of Plaintiffs' respective attorneys, experts, advisors, agents, or representatives, but all such costs, fees, and expenses as approved by the Court shall be paid out of the Settlement Fund. Except as provided for in this Agreement, in no event shall Defendants or their insurers have any liability with respect to the giving of notice to Class Members, including, but not limited to, the expense and cost of such notice.

18. If the Court refuses to approve this Agreement or any part hereof, or if such approval is modified or set aside on appeal, or if the Court does not enter the final judgment as provided in this Agreement, or if the Court enters the final judgment and appellate review is sought, and following appellate review, such final judgment is not ultimately affirmed upon exhaustion of the judicial process, then Defendants and the Plaintiffs shall each, in their sole discretion,

have the option to rescind this Agreement in its entirety, and any and all parts of the Settlement Fund, inclusive of interest accrued shall be returned forthwith to Defendants or the insurers in proportion to their initial contribution, less only such disbursements made in accordance with this Agreement. A modification of the proposed order with regard to its provisions for attorneys' fees or incentive awards, or a modification or reversal on appeal of any amount of Class Counsel's fees and expenses awarded by the Court from the Settlement Fund shall not be deemed a modification of all or a part of the terms of this Agreement or such final judgment.

19. Defendants and the Plaintiffs expressly reserve all of their rights if the Agreement does not become Finally Approved or if it is rescinded by the Plaintiffs or Defendants under paragraph 18. Further, and in any event, Plaintiffs and Defendants agree that this Agreement, whether or not it is Finally Approved and whether or not Plaintiffs or Defendants elect to rescind it under paragraph 18, and any and all negotiations, documents, and discussions associated with it, shall not be deemed or construed to be an admission or evidence of any violation of any statute, rule, regulation or law, or of any liability or wrongdoing by any Defendant, or of the truth of any of the claims or allegations contained in the Complaint or any other pleading filed by Plaintiffs in the Action, and evidence thereof shall not be discoverable or used directly or indirectly, in any way, whether in the Civil Action or in any other action or proceeding.

20. Class Counsel shall be solely responsible for timely filing all informational and other tax returns necessary to report any net taxable income earned by the Settlement Fund and shall timely file all informational and other tax returns necessary to report any income earned by the Settlement Fund and shall be solely responsible for timely taking out of the Settlement Fund, as and when legally required, any tax payments, including interest and penalties due on income earned by the Settlement Fund. All taxes (including any interest and penalties) due with respect to the income earned by the

Settlement Fund shall be paid from the Settlement Fund. Defendants shall have no responsibility to make any filings relating to the Settlement Fund and will have no responsibility to pay taxes on income earned by the Settlement Fund or pay any taxes on the Settlement Fund, unless the Settlement is not consummated and the Settlement Fund is returned. In the event the Settlement is not consummated, Defendants or their insurers in proportion to their settlement contributions shall be responsible for the payment of all taxes (including any interest or penalties) on said income.

21. The United States District Court for the Eastern District of Pennsylvania shall retain exclusive jurisdiction over the implementation, enforcement, and performance of this Agreement, and shall have exclusive jurisdiction over any suit, action, proceeding, or dispute arising out of or relating to this Agreement or the applicability of this Agreement that cannot be resolved by negotiation and agreement by Plaintiffs, any Class Member and Defendants. This Agreement shall be governed by and interpreted according to the substantive laws of the Commonwealth of Pennsylvania without regard to its choice of law or conflict of laws principles.

22. Defendants agree to cooperate with Plaintiffs by providing documents and electronic information required to facilitate notice to the Class and allocation and distribution of the fund to the class. To this end, Defendants agree to furnish at least the following at their expense:

(a) on or before June 26, in hard copy and electronic form, a list of all Class Members together with their last known addresses;

(b) within Fifty days of execution of this Agreement, in hard copy and in electronic form, and certified by Nihill & Riedley, P.C. a list containing the following, separately, for each member of the Class: showing the actual tuition and fees paid, any refunds received, and any federal or state aid other than loans (such as Pell grants) received;

(c) in the event the settlement administrator selected by class counsel requires any underlying record in order to pro-

cess the claim or any dispute over any claim, the underlying records the settlement administrator deems necessary to process the claim or resolve the dispute.

23. This Agreement constitutes the entire agreement among Plaintiffs and Defendants pertaining to the settlement of the Action against Defendants and supersedes any and all prior and contemporaneous undertakings of Plaintiffs and Defendants in connection therewith. This Agreement may be modified or amended only by a writing executed by Plaintiffs and Defendants, and approved by the Court.

24. This Agreement may be executed in counterparts by Plaintiffs and Defendants.

25. Neither Defendants nor Plaintiffs, or any of them, shall be considered to be the drafter of this Agreement or any of its provisions for the purpose of any statute, case law, or rule of interpretation or construction that would or might cause any provision to be construed against the drafter of this Agreement.

26. Nothing expressed or implied in this Agreement is intended to or shall be construed to confer upon or give any person or entity other than Plaintiffs, Class Members, Defendants, and those giving or receiving releases, any right or remedy under or by reason of this Agreement.

27. Neither this agreement, nor any act performed or document executed pursuant to or in furtherance of the agreement: (i) is or may be deemed to be or may be used as an admission of, or evidence of the validity of any Released Claim, or of any alleged wrongdoing or liability of the Defendants; or (ii) is or may be deemed to be or may be used as an admission of, or evidence of any fault or omission in any Court, administrative agency or other tribunal, other than in such proceedings as may be necessary to consummate or enforce the Agreement, or the Final Order and Judgment, except that the Defendants may file the Agreement and/or the Final Order and Judgment in any action that may be brought against them in order to support their defense therein, including, without limitation, any defense based on principles of res judicata, collateral estoppel, release, good faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense. Defendants have denied and continue to expressly deny and disclaim any liability or wrongdoing alleged. In addition, this agreement and any negotiations or proceedings hereunder are not, and shall not be construed as or deemed to be a concession by the Plaintiffs of any infirmity or weakness in their claims against Defendants.

28. The undersigned counsel represent that they are authorized to enter into this agreement on behalf of the parties they represent and, on behalf of themselves and the parties they represent, hereby agree to use their best efforts to obtain all approvals necessary and to do all other things necessary or helpful to effectuate the implementation of this Stipulation and Agreement according to its terms, including the exchange of documents and materials needed for the purpose of providing the Notice and conducting any hearing, and to satisfy the material conditions of this Stipulation and Agreement.

29. This Agreement shall be binding upon Defendant Ultrasound Technical Services, Inc. or any successor corporation owned by Whitman providing programs in either general ultrasound or cardiovascular technology or upon any purchaser or assignee of all or substantially all of UTS' business and/or assets, and shall inure to the benefit of such entity.