**In re CENDANT CORPORATION,
DERIVATIVE ACTION
LITIGATION.**

Civ. No. 98–1998 (WHW).

United States District Court,
D. New Jersey.

Nov. 19, 2002.

Bruce E. Gerstein, Barry S. Taus, Brett Cebulash, Kevin S. Landau, Garwin Bronzaft, Gerstein & Fisher, L.L.P., New York, NY, David M. Taus, Law Office of Francis J. DeVito, P.A., Hackensack, NJ, Elwood S. Simon, John P. Zuccarini, Elwood S. Simon & Associates, P.C., Birmingham, MI, Thomas G. Shapiro, Shapiro Haber & Urmy LLP, Boston, MA, Richard B. Brualdi, Law Offices of Richard B. Brualdi, New York, NY, Jerald Stein, Law Offices of Jerald Stein, New York, NY, Robert I. Harwood, Wechsler, Harwood, Halebian & Feffer, New York, NY, Joseph A. Rosenthal, Norman M. Monhait, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware, for Derivative Plaintiff Martin G. Deutch.

Jonathan Lerner, Samuel Kadet, Skadden, Arps, Slate, Meagher & Flom, L.L.P., New York, NY, Michael Rosenbaum, Carl Greenberg, Budd, Larner, Gross, Rosenbaum, Greenberg & Sade, P.C., Short Hills, NJ, for Nominal Defendant Cendant Corp., Herbert J. Stern, Stern Greenberg & Kilcullen, Roseland, NJ, James G. Kreissman, Simpson, Thacher & Bartlett, New York, NY, for the HFS Defendants, Steven S. Radin, Sills, Cummis, Zuckerman, Radin, Tischman, Epstein & Gross, Newark, NJ, Dennis J. Block, Cadwalader, Wickersham & Taft, New York, NY, for

the CUC Defendants, Richard J. Schaeffer, Bruce Handler, Dornbush, Mensch, Mandelstam & Schaeffer, LLP, New York, NY, for Defendant Shelton, Donald A. Robinson, Lapidus & Livelli, Newark, NJ, Gary P. Naftalis, Kramer, Levin, Naftalis & Frankel, New York, NY, for Defendant Corigliano.

Michael Griffinger, Gibbons, Del Deo, Doaln, Griffinger & Vecchione, PC, Newark, NJ, for the Special Litigation Committee.

Brian Fintan Moore, Lowenstein Sandler, PC, Roseland, NJ, for Consolidated-Defendant.

## OPINION

WALLS, District Judge.

This matter is before the Court on the application of Bruce E. Gerstein of Garwin, Bronzaft, Gerstein & Fisher, LLP, lead counsel ("Lead Counsel") for Plaintiff Martin Deutch ("Derivative Plaintiff" or "Deutch") in the above-captioned matter, brought on behalf of nominal defendant Cendant Corporation ("Cendant"), for approval of the proposed settlement against certain defendants (the "Settlement Agreement") and for attorneys' fees and reimbursement of expenses. Lawrence W. Schonbrun ("Schonbrun"), counsel for shareholder Walter Kaufman, submitted an objection to the proposed award for attorneys' fees and presented his objections before the Court at oral argument on October 21, 2002. Both the settlement and the application for attorneys' fees are approved.

BACKGROUND

Cendant was formed on December 17, 1997, through the merger of CUC International, Inc. ("CUC") and HFS, Inc. ("HFS"). On April 15, 1998, Cendant announced "accounting irregularities" regarding the past financial performance of CUC. Several actions were filed as a result of this disclosure. This derivative action was first brought on April 27, 1998, and a Verified Amended Derivative Complaint (the "Amended Complaint") was filed on December 7, 1998 by Derivative Plaintiff on behalf of Cendant, naming several defendants. The first group of defendants were Henry R. Silverman, Martin L. Edelman, John D. Snodgrass, James E. Buckman, Michael P. Monaco, Stephen P. Holmes, Robert D. Kunisch, E. John Rosenwald Jr., Christel Dehaan (collectively the "HFS Defendants"), and Leonard S. Coleman, Brian Mulroney, Robert E. Nederlander, Robert W. Pittman, Robert F. Smith, and Leonard Schutzmann (collectively the "Cendant Director Defendants"). These defendants, along with nominal defendant Cendant, are parties to the Settlement Agreement. Other groups of defendants came from CUC: T. Barnes Donnelley, Stanley Rumbough, Jr., Bartlett Burnap, Burton C. Perfit, Robert T. Tucker (along with Robert P. Rittereiser, Frederick Green, Anthony G. Petrello, Stephen A. Greyser, Craig R. Stapleton, and Carole G. Hankin, the "CUC Director Defendants"); and Walter A. Forbes, Christopher K. McLeod, E. Kirk Shelton, and Cosmo Corigliano (the "CUC Officer Defendants"). The Amended Complaint also named Amy Lipton and Bear Stearns, Inc., as defendants, although each were dismissed by order of the Court dated August 9, 1999.

While this action proceeded, certain of Cendant's shareholders prosecuted a securities class action case against Cendant for the accounting irregularities at CUC (the "Class Action"). An agreement to settle the Class Action for $3.2 billion was reached on March 17, 2000, and this Court approved the settlement on August 14, 2000 over Deutch's objections. The Court of Appeals for the Third Circuit affirmed

the Court's approval of the settlement on August 28, 2001. This action, therefore, became an effort to recoup from the defendants the $3.2 billion that the corporation paid out in the settlement of the Class Action.

On September 19, 2000, a Cendant shareholder brought a second derivative action in Delaware state court, captioned *Resnik v. Silverman, et al.*, Civil Action No. 18329 (the "Resnik Action"). By order of the Delaware Chancery Court dated May 2, 2001, the Resnik Action was stayed pending the resolution of this case.

Derivative Plaintiff now comes before the Court seeking approval of the Settlement Agreement between him and Cendant, the Cendant Director Defendants, and the HFS Director Defendants (collectively, the "Settling Defendants"). The settlement calls for a payment of $54 million in return for a release of the Settling Defendants from this action and the Resnik action. Significantly, the settlement expressly preserves the claims against CUC Officer Defendants E. Kirk Shelton, Walter A. Forbes, Christopher K. McLeod, and Cosmo Corigliano, and defendants Stuart Bell, Amy Lipton, and Anne Pember, as well as claims against the Reliance Insurance Company, which wrote certain Director and Officer liability policies for Cendant and which is currently in liquidation in Pennsylvania.

ANALYSIS

I. Settlement

 Rule 23.1 governs a court's analysis of the fairness of a settlement of a shareholder derivative action: "The action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to shareholders or members in such manner as the court directs." In evaluating the settlement of a derivative action, the courts of this district should consider the factors applied initially to class action settlement agreements, and later to derivative actions. *Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1315 (3d Cir.1993), *citing Shlensky v. Dorsey*, 574 F.2d 131, 147–149 (3d Cir.1978). Thus, courts are required to "independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interest of those whose claims will be extinguished." *In re Cendant Corp. Litig.*, 264 F.3d 201, 231 (3d Cir.2001) (internal quotation omitted). Under Rule 23(e), which governs the evaluation of a class action settlement, the District Court acts as a fiduciary guarding the rights of absent class members and must determine that the proffered settlement is "fair, reasonable, and adequate." *Id.*

 In analyzing the Settlement Agreement, the Court must apply the nine-factor test developed in *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir.1975). They are:

1. The complexity, expense, and likely duration of the litigation.

2. The reaction of the class to the settlement.

3. The stage of the proceedings and the amount of discovery completed.

4. The risks of establishing liability.

5. The risks of establishing damages.

6. The risks of maintaining the class action through the trial.

7. The ability of the defendants to withstand a greater judgment.

8. The range of reasonableness of the settlement fund in light of the best possible recovery.

9. The range of reasonableness of the settlement fund in light of all the attendant risks of litigation.

*Id.* The proponents of a settlement bear the burden to demonstrate that these factors weigh in favor of settlement. *In re Cendant,* 264 F.3d at 232.

Here there has been no objection made to the settlement itself; Schonbrun at oral argument stated that his sole objection was to the amount of the attorneys' fees, not to the settlement. Nevertheless, as required, the Court will examine each of the factors.

■ *The complexity, expense, and likely duration of the litigation.* This factor is designed to capture "the probable costs, in both time and money, of continued litigation." *In re Cendant,* 264 F.3d at 234 (citation omitted). Derivative Plaintiff contends, "Continued prosecution of this action through trial and subsequent appeals against the vigorous, determined, and resourceful opposition of the individual defendants would undoubtedly require significant time and would entail enormous additional effort and expense with no promise of any greater recovery than that earned in the Settlement." Derivative Plaintiff argues that this case, unlike the Class Action, "involves complexities unique to derivative lawsuits, such as: (a) futility of demand issues; (b) the effect of the [Special Litigation Committee] on the future viability of this action; (c) the effect of the indemnification provisions contained in Cendant's by-laws on the defendants' liability and type of damages; (d) whether each individual defendant breached his or her fiduciary duties; (e) whether causation and damages can be established with respect to each individual defendant; and (f) whether insurance would ultimately cover any claims brought by Derivative Plaintiff." Derivative Plaintiff points out that this case is more complex than the Class Action, "where liability of the Company was basically assured from the outset."

This litigation was filed in 1998 and has been the subject of large-scale discovery and extensive motion practice, including appeals to the Third Circuit. Even after this activity, issues remain against the Settling Defendants, and proof of liability against the Settling Defendants is a complex question and is far from certain. Unlike the settlement of the Class Action claims against Cendant, in this case the liability of the Settling Defendants is not a foregone conclusion, meaning that significant time and energy would be required to prosecute this case; this settlement is akin the settlement of the class action claims against Ernst & Young, in which the Third Circuit found that disputed questions of liability and damages "would involve fairly complex and protracted litigation." *See In re Cendant,* 264 F.3d at 234 (holding that factor weighed against approval of settlement with Cendant, whose liability was established, but in favor of approval of settlement with Ernst & Young, which denied liability and possessed a variety of defenses). The Court finds that this factor weighs in favor of approving the Settlement Agreement.

■ *The reaction of the class to the settlement.* This factor "attempts to gauge whether members of the class support the settlement." *In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 148 F.3d 283, 318 (3d Cir.1998). Although over 200,000 notices of the settlement were sent out to Cendant's common stockholders and a Summary Notice was published in the *Wall Street Journal,* only four shareholders (representing less than 0.000009 percent of Cendant's outstanding shares) questioned the settlement, and none filed an official objection with the Court. Given that no formal objection was filed to the settlement itself, there is little doubt that this factor weighs in favor of approval of the Settlement Agreement.

*See Cendant,* 264 F.3d at 235 (finding that only six objections arising from 478,000 notices was a "vast disparity" that "create[d] a strong presumption that this factor weighs in favor of" approving settlement).

■ *The stage of the proceedings and the amount of discovery completed.* This factor "captures the degree of case development that ... counsel have accomplished prior to settlement. Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *In re Cendant,* 264 F.3d at 235 (citations omitted). To guarantee that a proposed settlement is the result of informed negotiations, "there should be an inquiry into the type and amount of discovery the parties have undertaken." *In re Prudential,* 148 F.3d at 319. Derivative Plaintiff's counsel states that it "only settled this case after four years of litigation, including a thorough investigation of the facts and circumstances giving rise to the action; extensive motion practice and appeals; the filing of a separate action in Delaware state court; and comprehensive document and deposition discovery of parties and non-parties." Derivative Plaintiff's counsel further says that "the evidence adduced to date indicated that the defendants other than the [non-settling] CUC Officer Defendants had substantial defenses to liability," including evidence that the settling defendants relied on E & Y's representations as to CUC's financial results, which made proving scienter (as part of insider trading claims) more difficult. Derivative Plaintiff's counsel further points out that the Settlement Agreement is the product of "arm's-length negotiations conducted by capable counsel who are well-experienced in complex securities and derivative litigation."

As noted, this litigation is far along and a substantial amount of discovery has taken place. According to the submissions of Derivative Plaintiff, which are not disputed, counsel through the course of discovery "reviewed upwards of one million pages of documents" and "conducted, attended, and/or reviewed hundreds of depositions, transcripts, and/or deposition exhibits." No observer attempting to be objective could conclude that this case was at an early stage or that the proposed settlement was reached before either party had thoroughly explored its likelihood of success. The Court finds that Derivative Plaintiff has sufficiently developed his case to form "an excellent idea of the merits of its case." *In re Cendant,* 264 F.3d at 236. This factor weighs in favor of approving the Settlement Agreement.

■ *The risks of establishing liability.* "A court considers this factor in order to 'examine what the potential rewards (or downside) of litigation might have been had ... counsel decided to litigate the claims rather than settle them." *In re Cendant,* 264 F.3d at 237 (citation omitted). Derivative Plaintiff argues that proving liability against the Settling Defendants is no sure thing due to the defenses potentially available to them. In order to establish liability based on state law claims, Derivative Plaintiff likely would have to prove bad faith on the part of the Cendant Director Defendants. For claims arising under Rule 10b–5, Derivative Plaintiff would have to prove that the Settling Defendants acted with the requisite scienter. Indeed, for all the claims against non-CUC Officer Defendants, including claims of breach of fiduciary duty regarding the CUC–HFS merger and publishing false financial statements, Derivative Plaintiff faced the burden of proving knowledge of the falsity of the financial information. According to the Derivative

Plaintiff, the evidence developed during discovery indicated that all of the Settling Defendants met with Ernst & Young, which informed them that CUC's financial reports had been properly prepared and conformed with GAAP, and which later issued an audit report stating as much. The Settling Defendants, therefore, could use their alleged reliance on Ernst & Young to defend against Derivative Plaintiff's claims requiring bad faith or knowledge. Put another way, in Derivative Plaintiff's words, "A reasonable jury might well find that all of these [settling] defendants were entitled to rely on the representations of E & Y and the CUC Officer Defendants with regard to the accuracy of CUC's certified financial statements." Derivative Plaintiff also argues that "if the CUC Officer Defendants were found primarily or wholly responsible, the D & O insurance carriers could have a strong argument to disclaim coverage" for any liability of the Settling Defendants.

In short, Derivative Plaintiff's counsel makes a number of convincing arguments that the risks of establishing liability against the Settling Defendants is substantial. While the Court will not attempt to assess this case on its merits, it does take note of and recognizes the potentially powerful defenses available to the Settling Defendants. This factor weighs in favor of approving the settlement.

 *The risks of establishing damages.* "Like the fourth factor, 'this inquiry attempts to measure the expected value of litigating the action rather than settling it at the current time.'" *Cendant,* 264 F.3d at 238–239 (citations omitted). Derivative Plaintiff argues that the issue of damages at trial would result in a "battle of the experts" which by its nature is "fraught with uncertainty." Derivative Plaintiff continues: "Moreover, it is quite likely that a reasonable jury would find that

most if not all of the harm caused to Cendant was as a result of the conduct of the [non-settling] CUC Officer Defendants in publishing false financial statements." This might, counsel argues, reduce the amount recovered against the Settling Defendants and give the E & O carriers grounds to disclaim coverage. It is difficult for the Court to assess the likelihood of Derivative Plaintiff's ability to establish damages without having access to the full universe of information, including reports of expert witnesses, available to the parties. The Court does recognize, however, the risks inherent in relying on expert testimony and the unpredictability of juries in assessing damages. As the Third Circuit observed in *Cendant,* where a jury is presented with complex expert testimony on damages, and is "confronted with competing expert opinions of corresponding complexity, there is no compelling reason to think that it would accept [the plaintiff's] determination rather than [the defendant's], which would posit a much lower figure for the … damages." *In re Cendant,* 264 F.3d at 239. The Third Circuit held that such uncertainty "means that this factor weighs in favor of approval" of a settlement. *Id.* This factor here weighs in favor of approval of the Settlement Agreement.

 *The risks of maintaining the derivative action.* In the context of a class action, this factor chiefly attempts to weigh the prospects of obtaining and maintaining class certification. *In re General Motors Corp. Pick–Up Truck Fuel Tank Prod. Liab. Litig.,* 55 F.3d 768, 817 (3d Cir.1995). Such risks do not exist in a derivative action. The chief risk in maintaining this derivative action is that the Special Litigation Committee might choose to reject the case, thereby potentially putting an end to it. A special litigation committee has the authority under certain

circumstances to move to dismiss a derivative lawsuit if, in its judgment, further pursuit of its claims would not benefit the corporation. *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 102, 111 S.Ct. 1711, 1719, 114 L.Ed.2d 152 (1991). That risk is present in any derivative lawsuit, including this case. The SLC has determined that this Settlement Agreement is in the company's best interest. The SLC's adoption of the settlement is significant because it avoids the SLC's potential dismissal of the case. This factor weighs in favor of approval of the Settlement Agreement.

■ *The ability of the individual defendants to withstand a greater judgment.* This factor "is concerned with whether the defendants could withstand a judgment for an amount significantly greater than the settlement." *Cendant*, 264 F.3d at 240. The Court is not in an advantageous position to gauge the ability of the Settling Defendants to pay a larger judgment. *See Id.* at 241 ("there is inevitably a measure of speculation involved in this determination"). The Court recognizes, however, that the settlement is being paid by Cendant's directors and officers liability insurance carriers, which almost certainly have available to them funds in excess of the settlement amount. Given this likelihood, this factor cuts against approval of the Settlement Agreement. However, given the "built-in limitations" of this analysis, the weight of this factor is only moderate. *Cendant*, 264 F.3d at 241.

■ *The range of reasonableness in light of the best possible recovery and the risks of litigation.* At oral argument, Lead Counsel conceded that the maximum possible recovery in this litigation is $3.2 billion—the total amount of the settlement in the Class Action. The settlement of $54 million represents less than two percent of that amount, a small percentage. This amount may be justifiable, however, given the fact that the Settling Defendants appear to have significant defenses that increase the risks of litigation. Indeed, as the risks of litigation increase, the range of reasonableness correspondingly decreases. *See Cendant*, 264 F.3d at 242; *Bell Atlantic*, 2 F.3d at 1313. Here there is no indication that litigating this case to trial is likely to produce a greater judgment against the Settling Defendants.

Particularly significant is the Settlement Agreement's preservation of claims against the CUC defendants. These defendants, who likely will be deprived of some of the defenses of the Settling Defenses because of their alleged responsibility for CUC's financial statements, may still be pursued by the Derivative Plaintiff. The ultimate recovery in this case therefore may eventually exceed the settlement amount. Considering all the circumstances, the Court finds that this factor weighs in favor of approving the settlement.

*Summing Up the Girsh Factors.* In sum, the Court finds that the great weight of the relevant factors militates in favor of approving the settlement. The Court, in its discretion, approves the Settlement Agreement.

## II. ATTORNEYS' FEES

Lead counsel makes an application for $12 million in attorneys' fees, representing approximately 22 percent of the total settlement amount. It is to this application that Schonbrun objects.

### A. Percentage of Recovery

■ A district court has wide discretion to set fees. *See Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 (3d Cir.2000). In making its determination, however, a district court must make its reasoning and application of fee-awards ju-

risprudence clear. *Id.* In so-called "common-fund" cases, a district court should generally apply a percentage-of-recovery method of computing attorneys' fees. *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 734 (3d Cir.2001).[1] In doing so, the court should consider the following factors:

1. The size of the fund created and the number of persons benefitted.

2. The presence of absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel.

3. The skill and efficiency of the attorneys involved.

4. The complexity and duration of the litigation.

5. The risk of nonpayment.

6. The amount of time devoted to the case by plaintiffs' counsel.

7. The awards in similar cases.

*Gunter*, 223 F.3d at 195 n. 1. These factors need not be applied in a formulaic way, and their weight may vary on a case-by-base basis. *Id.* In cases like this one that do not involve extremely large settlement awards, district courts should check the percentage award against the "lodestar" method to ensure that plaintiff's counsel is not receiving a windfall. *Id.* All of these calculations should be reduced to writing. *Id.*

■ *The size of the fund created and the number of persons benefitted.* As a

general rule, as the size of a fund increases, the appropriate percentage to be awarded to counsel decreases. *In re Cendant PRIDES*, 243 F.3d at 736. The Circuit has explained that the "basis for this inverse relationship is the belief that 'in many instances the increase [in recovery] is merely a factor of the size of the class' and has no direct relationship to the efforts of counsel." *In re Prudential*, 148 F.3d at 339. As noted above, the settlement is for $54 million. This places it firmly in the category of "moderate" awards; certainly it is not a "mega"-fund case, which generally require awards of at least $100 million. *In re Aetna, Inc.*, No. MDL 1219, 2001 WL 20928 at *15 (E.D.Pa. Jan.4, 2001) ($81 million settlement is "smaller than the large settlements for which courts decrease the percentage awarded"); *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 195 (E.D.Pa.2000) ("$100 million seems to be the informal marker of a 'very large' settlement"). This factor weighs in favor of approving the application for attorney's fees.

■ *The presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel.* The absence of large numbers of objections mitigates against reducing fee awards. *In re Aetna*, 2001 WL 20928 at *15 (lack of objections supported award of fees requested); *see also In re General Motors*, 55 F.3d at 812

**1.** Common-fund cases allow "a person who maintains a lawsuit that results in the creation, preservation, or increase of a fund in which others have a common interest[ ] to be reimbursed from that fund for litigation expenses incurred." *In re Cendant*, 264 F.3d at 256. In common fund cases, the fees paid to counsel come directly out of the recovery available to the interested parties, so that every dollar paid to counsel results in one less dollar for the plaintiffs. *Id.* It is true that, strictly speaking, a shareholder derivative ac-

tion is not a typical "common fund" case, because the award is collected by the derivative plaintiff on behalf of the corporation, the true party in interest. *See In re Chambers Dev. Sec. Litig.*, 912 F.Supp. 852, 863 (W.D.Pa.1995). However, the Third Circuit has recognized that plaintiffs in a derivative action may recover attorneys' fees from the award obtained through prosecuting the case as in a more traditional common-fund suit, i.e. a class action. *See Shlensky v. Dorsey*, 574 F.2d 131 (3d Cir.1978).

(stating that it is generally assumed that "silence constitutes tacit consent to the agreement") (citations omitted); *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 149 (E.D.Pa.2000) (lack of objections supported approval of the fee request). Only one shareholder, Mr. Kaufman, has filed an official objection to the amount of attorneys' fees included in the Settlement Agreement. Five other shareholders wrote to either the Court or to counsel to object to the amount of attorneys' fees. These six complaints arise out of the 200,000 notices that have been sent out to Cendant shareholders, notifying them of the settlement terms and the proposed attorneys' fees. The merits of Mr. Kaufman's objections will be addressed later in this opinion. At this juncture, it is appropriate to note the extremely small number of complaints that have arisen regarding the proposed attorneys' fees in the Settlement Agreement. This factor weighs in favor of approval of the requested attorneys' fees.

 *The skill and efficiency of the attorneys involved.* As explained by the Circuit, the goal of the percentage-of-recovery method to calculate fees is to ensure "that competent counsel continue to undertake risky, complex, and novel litigation." *Gunter*, 223 F.3d at 195 n. 1. The single clearest factor reflecting the quality of counsel's services is the result obtained. *Cullen*, 197 F.R.D. at 149.

There is little doubt that Lead Counsel is highly skilled and experienced in litigating shareholder derivative suits. The firm's resume indicates that it has prosecuted and obtained favorable results in a number of derivative actions, as well as several other non-derivative securities litigations. At oral argument, Schonbrun conceded that he was neither disputing nor challenging the abilities or skills of Lead Counsel.

Schonbrun did object, however, to the seven additional firms that seek fees through this application. As discussed more fully below, Schonbrun's objections are based on the allegedly duplicative nature of the work taken on by non-lead Derivative Plaintiff's counsel. This alleged duplication of effort, however, is not evident when examining the proposed percentage of recovery. To the extent that there may exist evidence to support this objection, it is made clear only upon examination of the attorneys' submissions regarding their lodestars, as discussed later. At this stage, it is appropriate to note that the best indication of counsel's abilities—the result obtained—indicates that counsel is skilled and effective, for the earlier reasons in approval of the Settlement Agreement. This factor weighs in favor of awarding the requested fees.

*The complexity and duration of the litigation and the amount of time devoted by plaintiff's counsel.* It is further undisputed that this is a complex, long-standing case. The case was filed in 1998 and has been the subject of a great deal of discovery and motion practice. At least one of these motions involved the development of new law under the PSLRA—namely, Derivative Plaintiff's unsuccessful attempt to challenge the settlement of the Class Action through the assertion of federal contribution claims, a theory that was ultimately rejected by this Court and the Third Circuit, which held that the appropriate remedy was a state law derivative action claim. Derivative Plaintiff's counsel successfully developed its case, survived several motions to dismiss filed by the derivative defendants, and undertook discovery that included the review of over one million pages of documents and the conducting, attending, or reviewing of dozens of depositions. And, of course, Derivative Plaintiff's counsel ultimately engaged in

the negotiations resulting in the Settlement Agreement. In short, this complex case by all accounts has been actively pursued for several years by the effort and expense of Derivative Plaintiff's counsel, which by its calculations have spent over 12,000 hours prosecuting the case. This factor weighs in favor of approval of the requested attorneys' fees.

*The risk of nonpayment.* Some courts have interpreted this factor as requiring an assessment of the likelihood that a successful verdict will go uncollected because of a defendant's potential bankruptcy, insolvency, or lack of assets. *See In re Safety Components Sec. Litig.*, 166 F.Supp.2d 72, 100 (D.N.J.2001). Here, as discussed, that risk does not appear to be present. Instead, the chief risk of nonpayment in this case arose from Derivative Plaintiff's counsel's acceptance of the case on a contingency-fee basis. Lead Counsel argues that, unlike the Cendant-related class action cases, liability in this case was not assured by Cendant's admission that it (or its constituent parts) had issued false financial statements because an individual defendant's knowledge of the falsity of those statements would have had to be demonstrated in order to prove his liability. As recognized in the discussion of the fairness of the settlement, this difficulty in proving liability was but one obstacle to recovery. Proof of damages, potential adverse action by the SLC, and the indemnity and exculpatory provisions of Cendant's by-laws were also among the issues that Derivative Plaintiff's counsel would have had to satisfy before any recovery could be expected, and before counsel could receive any payment. In accepting the case on a contingency-fee basis, Derivative Plaintiff's counsel assumed the legitimate risk that it would be unable to successfully prosecute its complex derivative action. This risk, however, is present in any litigation, and while the risk may have been greater in

this case than in others, it does not strike the Court as particularly significant or noteworthy. This factor is therefore neutral in the evaluation of the requested attorneys' fees.

*The awards in similar cases.* The seventh *Gunter* factor is "the awards in similar cases." *Gunter*, 223 F.3d at 195 n. 1. The Third Circuit has noted that while percentages awarded have varied considerably, most fee awards range "from nineteen percent to forty-five percent of the settlement fund." *In re Cendant PRIDES*, 243 F.3d at 736. Another court within this district, ruling on the settlement of a securities class action, observed that although "[t]he median in class actions is approximately twenty-five percent, ... awards of thirty percent are not uncommon." *In re Ikon*, 194 F.R.D. at 194 (citations omitted).

The Third Circuit has also explained, however, that a District Court should not "rely on a formulaic application of the appropriate range in awarding fees but must consider the relevant circumstances of the particular case." *In re Cendant PRIDES*, 243 F.3d at 736. Recently, a court in this district made a study of "fee awards in common fund cases decided over the last few years," finding a series of cases which provided for attorney awards ranging from 27.5% to 33.8% and totaling from $1.46 million to $37.1 million. *See In re Safety Components*, 166 F.Supp.2d at 101. Another court noted that "[s]cores of cases exist where fees were awarded in the one-third to one-half of the settlement fund." *In re Aremissoft Corp. Sec. Litig.*, No. 01-2486, 2002 WL 1769019 at *26 (D.N.J. July 31, 2002). Still other courts have used 25 percent in cases with multi-million dollar settlements as a "benchmark ... in order to prevent a windfall to counsel." *Erie County Retirees Assoc. v. County of Erie, Pa.*, 192 F.Supp.2d 369, 381 (W.D.Pa.2002).

Moreover, cases with procedural postures and common funds similar to this case have resulted in greater attorney awards than those sought here. *See, e.g., In re General Instrument Sec. Litig.,* 209 F.Supp.2d 423, 434 (E.D.Pa.2001) (approving attorneys' fee of 33% of $48 million settlement of securities class action after six years of litigation featuring extensive discovery and significant motion practice); *In re Medical X–Ray Film Antitrust Litig.,* No 93–5904, 1998 WL 661515 at *8 (E.D.N.Y. Aug.7, 1998) (approving attorneys' fees of 33.3% of $39 million settlement of five-year-old antitrust class action).

Here the settlement calls for a common fund of $54 million, and the sought-after fees of $12 million represent 22 percent of that amount. Such a request is well within the range of similar cases. This factor weighs in favor of approval of the proposed fee award.

*Summary of the Gunter factors*

A summary of the factors presents the following picture: Derivative Plaintiff's counsel, expert and skilled in prosecuting derivative suits, brought this action against a group of individual defendants on a contingency-fee basis. Counsel prosecuted the action over a four-year period, during which a great amount of time and energy was devoted to all aspects of the case, including a significant amount of discovery and motion practice. At all times, and especially in regards to the settling defendants, the liability of defendants and eventual success of the action remained an open question. After four years of litigation, Derivative Plaintiff's counsel has reached an agreement with the Settling Defendants to secure an immediate $54 million recovery on behalf of the company while preserving claims against the non-settling defendants, whose potential liability is at least arguably greater than that of

the Settling Defendants. Notice of the Settlement Agreement, including its proposed attorney's fees, was sent to 200,000 shareholders, only six of whom registered any complaint at all regarding the attorneys fees and only one of whom filed an official objection with the Court. Moreover, the attorneys' fees included in the Settlement Agreement, representing 22 percent of the total award, is well within the range of fees awarded on a percentage basis in similar cases. A review of the *Gunter* factors indicates that an award of 22% is fair and reasonable.

## B. Check against Lodestar

 The next step is for the Court to examine Derivative Plaintiff's counsel's lodestars to cross-check the reasonableness of the percentage award. In common-fund cases, the Third Circuit has suggested that "it is advisable to cross-check the percentage award counsel asks for against the lodestar method of awarding fees so as to insure that plaintiff's lawyers are not receiving an excessive fee at their clients' expense." *Gunter,* 223 F.3d at 190, citing *In re Prudential,* 148 F.3d at 333. A court determines "an attorneys' lodestar award by multiplying the number of hours he or she reasonably worked on a client's case by a reasonable hourly billing rate for such services given the geographical area, the nature of the services provided, and the experience of the lawyer." *Gunter,* 223 F.3d at 195 n. 1. To examine the lodestar factor effectively, "a Court should make explicit findings about how much time counsel reasonably devoted to a given matter, and what a reasonable hourly rate would be for such services." *Id.* at 199–200. A court may then multiply the lodestar calculation to reflect "the risks of nonrecovery, to reward an extraordinary result, or to encourage counsel to under-

take socially useful litigation." *In re Safety Components,* 166 F.Supp.2d at 103, *quoting In re Aetna,* 2001 WL 20928, at * 15.

Here, eight law firms have submitted lodestars totalling $4,636,155.65. A further breakdown of the data provided by the firms reveals the following information:

| Firm | Hours | Rates (dollars per hour) | Lodestar (dollars) | Tasks (hours) |
|---|---|---|---|---|
| Garwin, Bronzaft, Gerstein & Fisher | 9,078.25 | Partners: 400–550<br>Associates: 225–310<br>Other staff: 80–170 | 3,436,042.50 | Investigations: 1,610.75<br>Discovery: 2,722<br>Pleadings: 3,445.25<br>Appearances: 146.75<br>Settlement: 871.25<br>Strategy: 282.25 |
| Shapiro Haber & Urmy | 206.2 | Attorneys: 250–485<br>Staff: 125 | 70,885.50 | See (a) |
| Wechsler Harwood Halebian & Feffer | 82.7 | Partners: 400–475<br>Associates: 300<br>Staff: 140 | 33,518.00 | See (b) |
| Elwood S. Simon & Assocs. | 2,111.75 | Partners: 295–465<br>Associates: 200–250 | 813,333.75 | See (c) |
| Law Office of Jerald Stein | 100.34 | 385 | 38,630.90 | Document discovery (all) |
| Rosenthal Monhait Gross & Goddess | 12 | 350 | 4,200.00 | See (d) |
| Francis J. DeVito, P.A. | 279.35 | 300 | 80,805.00 | See (e) |
| Law Office of Richard Brualdi | 294.8 | Partner: 550<br>Associate: 350 | 158,740.00 | Investigations: 83<br>Discovery: 43.3<br>Pleadings: 137.6<br>Appearances: 26.2<br>Strategy: 4.7 |
| Total | 12,165.4 | | 4,636,155.65 | |

(a) "[A] number of specific assignments from lead counsel, including research on the law concerning demand on directors, assistance with opposition to defendants' motion to dismiss, the examination of documents in New York City, and research for the opposition to defendants' motion for summary judgment." Not broken down by hours devoted to each task.

(b) "[A]ssisted in the fact and legal research that led to the filing of the Delaware complaint as well as comprehensive analysis of the motions to dismiss and stay." Not broken down by hours devoted to each task.

(c) "[I]ntimately involved in every aspect of this litigation." Submitted list over one page long of specific tasks, but no breakdown of hours devoted to each type of task.

(d) Local Delaware counsel; "advised plaintiff's New York counsel on Delaware practice and procedure; researched legal issues; reviewed and edited drafts of complaints, briefs, settlement documents and correspondence with the Delaware Court and defendants' counsel; and communicated with defendants' counsel and the Delaware Court concerning briefing, discovery, and scheduling." No further breakdown.

(e) Local New Jersey counsel; "advised plaintiff's New York counsel on New Jersey practice and procedure; researched legal issues; reviewed and edited drafts of complaints, briefs, settlement documents and correspondence, participated in discovery proceedings; and communicated with and advised chief counsel concerning all matters relative to this case." No further breakdown.

With a total lodestar of $4,636,155.65, and a requested attorneys' fee award of $12 million, the multiplier or "risk factor" is approximately 2.59 (i.e. the requested fee is 2.59 times greater than the lodestar amount). Multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is

applied. *In re Safety Components,* 166 F.Supp.2d at 104, *quoting In re Prudential,* 148 F.3d at 341.

As an initial matter, the Court notes that neither Schonbrun nor any other shareholder has challenged the reasonableness of the hourly rates submitted by Derivative Plaintiff's counsel, which varied from $225 to $550 per hour for attorneys. Based on the evidence in the record and the lack of objections, the Court finds the rates submitted to be reasonable. *See Orthopedic Bone Screw Prods. Liab. Litig.,* No. 1014, 2000 WL 1622741 at *8 n. 18 (E.D.Pa. Oct.23, 2000) (hourly rate to be used in computing counsel's lodestar is rate that is normally charged by counsel of comparable standing, reputation, experience and ability in the community where counsel practices, which presumptively is the attorney's usual billing rate), *citing Cunningham v. City of McKeesport,* 753 F.2d 262 (3d Cir.1985), *vacated on other grounds,* 478 U.S. 1015, 106 S.Ct. 3324, 92 L.Ed.2d 731 (1986) (holding that reasonable attorney fees are generally determined by attorney's normal billing rate).

At oral argument, Schonbrun grounded his chief objection not on the performance or skill of Lead Counsel, nor on any counsel's hourly rates, but rather on the presence of and time expended by the other seven firms, whose total lodestar is over $1 million. Schonbrun suggested that their work might have been duplicative of the work done by Lead Counsel. Schonbrun also argued that the "risk factor" of 2.59 is too high.

■ Taking the last objection first, the Court finds that a risk factor of 2.59 is reasonable. Other common fund cases have resulted in approximately equal risk factors. *See In re Safety Components,* 166 F.Supp.2d at 104 (approving a risk factor of 2.81 and citing cases with risk factors ranging from 2.04 to 3.6). As Schonbrun

conceded at oral argument, the multiplier is included in the lodestar calculation to reflect "the risks of nonrecovery, to reward an extraordinary result, or to encourage counsel to undertake socially useful litigation." *In re Aetna,* 2001 WL 20928 at *15. In this case, as outlined above, the risk of non-recovery from the Settling Defendants was real, especially in light of the presence of the SLC and its potential right to take action to terminate the case. The multiplier is appropriate.

■ The objections based on the presence of multiple firms and potential duplication of effort are more difficult to assess, however. A cursory review of the tasks performed by each firm does raise warning signs of duplication of work. As example, the Wechsler firm indicates that they assisted with "the fact and legal research that led to the filing of the Delaware complaint," while the Simon firm indicates that it performed "research for and drafting of the complaint for the separate state derivative action in Delaware." Similarly, Lead Counsel submits that it spent 2,722 hours on discovery; the Shapiro firm says it participated in "the examination of documents in New York City"; the Simon firm swears to its "participation in multiple reviews and analysis of Defendants' discovery responses and documents produced by Defendants and non-parties"; and the Stein firm claims to have spent all of its 100.34 hours on document discovery. Because of these submissions and others like it, the concerns expressed by Schonbrun are not difficult to appreciate.

At oral argument, Lead Counsel made the following point: this was a complex and time-consuming case, and if the non-lead firms had not taken up their respective tasks, then they would have been done by Lead Counsel, in which case, presumably, these questions would not arise. The Court observes that, even if Lead Counsel

is correct, certain economies of scale, which encourage attorneys to organize in law firms to begin with, may have been lost in farming out tasks to the non-lead firms. But the larger problem with Lead Counsel's position is that it is almost entirely unverifiable. Indeed, the debate over whether certain tasks were duplicated or not focuses on unverifiable arguments on each side. This is less the fault of counsel and more the weakness of the lodestar analysis as applied in common fund cases, which even when undertaken with rigor requires the Court to make determinations of reasonableness based on data that are difficult if not impossible to interpret. Indeed, the Court is not entirely convinced how it could determine whether certain tasks were "duplicative." If two attorneys at different firms were to examine the same document produced by the defendants, consider its relevance and probative value, and discuss it with others or even each other, would such work be "duplicative"? Short of monitoring the attorneys' thought processes and conversations, there is no way to tell if their activity is file-churning or an application of the maxim that "two heads are better than one."

This litigation has been going on for over four years. Derivative Plaintiff's counsel claims to have put in over 12,000 hours prosecuting it. That is roughly 3,000 hours per year—approximately the efforts of two full-time attorneys (or perhaps, if press reports are to be believed, closer to one, *see* Anthony Lin, *Clifford Chance Memo Voices Associate Unrest*, N.Y. Law Journal, October 25, 2002 at 1). That strikes the Court as within the range of credibility and reasonableness for a case of this complexity and magnitude. A reliable determination that is more precise or definitive than that is not possible.

In sum, the Court's cross-check of Derivative Plaintiff's counsels' lodestars confirms the reasonableness of the requested attorneys' fee award.

III. Expenses

Derivative Plaintiff's counsel seek reimbursement of $250,340.02 for expenses incurred in the prosecution of this matter. Counsel in common fund cases is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the case. *In re Safety Components*, 166 F.Supp.2d at 108, *citing Abrams v. Lightolier, Inc.*, 50 F.3d 1204, 1225 (3d Cir.1995).

The expenses for which Derivative Plaintiff's counsel seek reimbursement include: (1) funding of a "litigation fund" which paid for, among other items, transcripts and fees of experts and consultants; (2) court filings; (3) postal, overnight delivery, and courier charges; (4) travel and lodging; (5) computer-assisted research, such as Lexis and Westlaw; (6) telephone and facsimile charges; and (7) photocopying charges. Of these expenses, the "big-ticket" items are the funding of the litigation fund ($120,000) and computer research (approximately $69,000).

The affidavits and submissions of counsel demonstrate that the requested expenses were adequately documented, reasonable, and appropriately incurred. Several courts have held that photocopying expenses, telephone and facsimile charges, and postal, messenger, and express mail service charges are reasonably incurred in connection with the prosecution of a large litigation. *In re Safety Components*, 166 F.Supp.2d at 108, *citing Abrams*, 50 F.3d at 1225; *Cullen*, 197 F.R.D. at 151; *In re Residential Doors Antitrust Litig.*, No. 96–2125, 1998 WL 151804, at *2 (E.D.Pa. April 2, 1998).

Similarly, witness fees and the costs associated with expert witnesses and consultants are often deemed incidental to litigation. *In re Safety Components,* 166 F.Supp.2d at 108, *citing Cullen,* 197 F.R.D. at 151. Computer-assisted research is also essential to modern complex litigation. *Id.*

Because the expenses are adequately documented and appropriately incurred, and the amounts incurred appear to be reasonable, the request for reimbursement of expenses is approved.

## IV. Incentive Payment

 Lead Counsel seeks permission to make an incentive payment of $25,000 to Deutch out of the proposed attorneys' fees. Courts may grant incentive awards in class action cases to particular members of the class. *Brotherton v. Cleveland,* 141 F.Supp.2d. 907, 913 (S.D.Ohio 1991). Such awards are granted to reward the public service performed by lead plaintiffs in contributing to the vitality and enforcement of securities laws. *See In re SmithKline Beckman Corp. Sec. Litig.,* 751 F.Supp. 525, 535 (E.D.Pa.1990) (awarding incentive payments of $5,000 from the common fund). An incentive payment to come from the attorneys' fees awarded to plaintiff's counsel need not be subject to intensive scrutiny, as the interests of the corporation, the public, and the defendants are not directly affected. *In re Presidential Life Sec.,* 857 F.Supp. 331, 337 (S.D.N.Y.1994). Here Deutch has performed a public service through his willingness to step forward and represent Cendant and its shareholders, and the proposed payment will come from Derivative Plaintiff's counsel's attorneys' fees. The court approves the incentive payment of $25,000 to Derivative Plaintiff.

## CONCLUSION

For the reasons herein, both the settlement and the request for attorneys' fees and expenses are approved.